LILYE W. TUCKER, as Special Adm'r of the Estate of Elliott Tucker, Deceased, Plaintiff-Appellant, v. DIVISION SALES, INC., *et al.*, Defendants-Appellees.

Third District    No. 3—99—0106

Opinion filed July 31, 2000.—Rehearing denied August 30, 2000.

Lilye Tucker, of Joliet, for appellant.

Philip A. Troha, of Law Firm of Philip A. Troha, of Joliet, for appellee Justen Products.

Robert Marc Chemers, Adrian Mendoza, Daniel G. Wills, and Edward B. Ruff III, all of Pretzel & Stouffer, of Chicago, for appellee Division Sales, Inc.

JUSTICE HOLDRIDGE delivered the opinion of the court:

The plaintiff, Lilye W. Tucker, filed a products liability suit against the defendants, Division Sales, Inc., and Justen Products, after her son, Elliott, died while playing with a toy dart gun distributed by the defendants. The plaintiff claimed that the defendants' product was in a defective condition because it carried no warning about the possibility that the darts could be inhaled and interfere with the user's ability to breathe. A jury returned a verdict in favor of the defendants. On appeal, the plaintiff maintains that the jury's verdict was against the manifest weight of the evidence. She also claims that she was denied a fair trial when the defendants violated an order *in limine*. We agree that the defendants violated the order *in limine* and that these violations prejudiced the plaintiff's case. Consequently, we reverse the judgment of the trial court and remand for a new trial.

In December 1994, the plaintiff bought an "Uzi Dart Gun" set as a Christmas stocking "stuffer" for her son, Elliott, who was 12 years old. The darts included in this set were approximately 2½ inches long with a bulb at one end, which anchored the dart inside the gun, and a suction cup at the other end. The darts were made of a soft, malleable plastic.

On December 28, 1994, Elliott visited the apartment where the plaintiff's sister lived. With him were his siblings, several cousins, and two uncles. On that day, Elliott was playing with one of the darts from

his dart set. He held the dart in his mouth with the suction cup hanging out between his lips.

Elliott's aunt lived on the third floor of her apartment building. Looking down from the apartment, Elliott and some of his playmates saw a girl whom they thought they recognized. They ran down the stairs to talk to her. When they got to the bottom of the stairs, the boys called to the girl, but they did not know her as they had thought. Elliott made a remark and started to laugh. Then he got a strange look on his face, raced up the stairs and collapsed in the apartment. He was rushed to the hospital, but he could not be resuscitated. Elliott died at approximately 7:30 p.m.

An autopsy of Elliott's body revealed a dart lodged in the right bronchus, the tube that carries air into the lungs. The dart had been aspirated with the bulb end of the dart farthest into the bronchus. The suction-cup end was completely blocking Elliott's airway.

The plaintiff sued the defendants, alleging they designed, manufactured and distributed the dart gun set that had been given to Elliott. Count I alleged strict products liability and claimed that the dart was defective and in an unreasonably dangerous condition when it left the defendants' control because the package contained no warning of the danger of accidentally aspirating a dart. Count II alleged negligence. The plaintiff claimed that the threat of harm to children posed by the dart was foreseeable and that the defendants had failed to warn consumers of the dangers.

Before trial, the plaintiff filed a motion *in limine* to bar the defendants from asserting that Elliott's parents were negligent or claiming that any such negligence should be imputed to Elliott. The plaintiff further sought to bar the defendants from soliciting opinions regarding any alleged lack of supervision by Elliott's parents on the day of the accident. The trial court granted the plaintiff's motion with regard to both issues.

At trial, several of the children present on the day Elliott died testified about the events that preceded Elliott's death.

The plaintiff testified that she was very careful about the toys she bought for her children. She stated that if the dart gun set had carried a warning that a child might inhale the dart and suffocate, she would not have purchased the dart set. Elliott's father also testified that if he had known that the dart set presented a choking hazard, he would not have allowed Elliott to play with it.

The plaintiff's expert testified that the dart gun set was unreasonably dangerous and defective because it carried no warning of the choking hazard it presented. In the expert's view, it was "imminently foreseeable" that a 12-year-old would place the dart in his mouth to

moisten the tip because moistening the tip would allow the dart to stick better when shot. The expert also believed that it was foreseeable that while the dart was in the mouth, any number of things could cause a sharp intake of breath. This sharp intake of breath would cause the dart to be aspirated, causing the child's death.

The plaintiff's expert testified that he was aware that the dart gun package stated that the toy was for children aged 8 and over. He did not think this was an adequate warning because even children aged 8, 9, 10 or even 12 would not understand the risk of choking. In addition, the expert stated that his opinion would not change even though the toy passed the "cylinder test," which was developed to determine whether a toy presented a choking hazard to a three-year-old child.

On cross-examination of the plaintiff's expert, the defendants asked:

> "If the mother or adult supervising this child, and we're talking about Elliott Robinson Tucker, had seen him throughout the day with this dart in his mouth, sucking on it, chewing on it, just rolling it around in his mouth, you would have expected there to have been some kind of instruction to prohibit that activity, correct?"

The plaintiff objected to this question, claiming that it violated the order *in limine*. The trial judge overruled the objection, stating that the question was intended to illuminate "the boy's knowledge." In response to the question, the plaintiff's expert stated that he would expect a parent or supervising adult to caution a child generally not to put things in his mouth.

On further cross-examination, the following exchange took place:

> "Q. If someone had seen him that particular day with the dart in his mouth, just rolling it around in his mouth much like a child with a pacifier, much younger child, and had instructed him not to put it in his mouth, get that out of your mouth, and he continued—or else said or else [*sic*] you are going to choke on it, and he continues to have it in there, there is significant contributory aspect to his demise; is that correct?
>
> A. That's correct.
>
> Q. And you think a reasonably prudent user shouldn't put anything in their mouth, correct?
>
> A. As a safety professional that's what I would say. If you don't intend to eat it, don't put it in your mouth.
>
> Q. Similarly speaking, if the mother had instructed this child generally I don't want you to put things in your mouth, and she presumes him to have enough knowledge at 12 years of age, even though she didn't specifically instruct him about this specific dart, there would still be a significant contributory aspect to his demise; is that correct?

A. Well, I can't—I can't quantify that, but certainly there would be a contribution. How significant that is I think the trier of fact would determine.

Q. It would be significant in your opinion, correct?

A. Yes."

The defendants then offered their own expert testimony. Their expert testified that the chances of a child aspirating a dart were 1 in 2.5 million. He based this calculation on the number of toy-related injuries over a period of 16 years and the number of deaths related to death from a projectile from a toy gun in that same time. According to the defendants' expert, there were only 32 injuries reported from projectiles from toy guns in the time from 1980 to 1996. Only one of these injuries, the case at bar, caused the death of the child. The defendants' expert further testified that a warning label would not have prevented Elliott's death because, in his opinion, warning labels do not change consumers' behavior.

The jury returned a verdict for the defendants. The plaintiff filed a posttrial motion in which she contended that the defendants had violated the order *in limine* and that the verdict was against the manifest weight of the evidence. The trial court denied the plaintiff's motion.

On appeal, the plaintiff argues that the defendants violated the order *in limine* because, on cross-examination of the plaintiff's expert, they asked questions designed to imply to the jury that Elliott's parents had not properly supervised him.

■ A motion *in limine* allows a litigant to obtain a pretrial order that excludes inadmissible evidence and bars questioning of witnesses regarding such evidence. *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 595 N.E.2d 1165 (1992). This procedure safeguards against the prejudicial impact resulting from asking questions and making objections before the jury regarding inadmissible evidence. *Lundell v. Citrano*, 129 Ill. App. 3d 390, 472 N.E.2d 541 (1984). The violation of an order *in limine* is reversible error when: (1) the order is specific; (2) the violation is clear; and (3) the opposing party is prejudiced by it. *Branum v. Slezak Construction Co.*, 289 Ill. App. 3d 948, 682 N.E.2d 1165 (1997). The trial judge's decision to grant or deny a new trial based on a violation of an order *in limine* will not be disturbed absent an abuse of discretion. *Kutchins v. Berg*, 264 Ill. App. 3d 926, 638 N.E.2d 673 (1994).

■ In the case at bar, the order *in limine* was specific. The defendants were barred from introducing any evidence that Elliott's parents were negligent or that Elliott and the other children lacked supervision on the day of Elliott's death. Yet the defendants asked the

plaintiff's expert whether he would expect Elliott's mother to instruct Elliott not to have the dart in his mouth or to prohibit Elliott from having the dart in his mouth. In addition, the defendants asked the plaintiff's expert what his conclusion would be if "someone" saw Elliott with the dart in his mouth on the day he died. Clearly, these questions violated the order *in limine*. Without directly asking the jury to consider whether Elliott's parents had been negligent or had failed to supervise Elliott, the defendants implied to the jury that Elliott's parents should have told him not to put the dart in his mouth and should have been with him on the day he died.

Finally, we must conclude that the plaintiff was prejudiced by the defendants' violation of the order *in limine*. Elliott's death was tragic. Naturally, the jury would want to blame someone for the death. By violating the order *in limine*, the defendants were able to obliquely point the finger at Elliott's parents and claim that the parents, not the defendants, were at fault. In this way, the defendants deprived the plaintiff of the opportunity to have her claim considered on its merits. We hold that the defendants' violation of the order *in limine* resulted in prejudice to the plaintiff. Thus, we must remand the matter for a new trial free of these prejudicial errors.

Inasmuch as we have determined that the plaintiff is entitled to a new trial, we need not consider the plaintiff's second contention on appeal, that the jury's verdict was against the manifest weight of the evidence.

The judgment of the circuit court of Will County is reversed and the matter remanded for further proceedings.

Reversed and remanded.

BRESLIN and LYTTON, JJ., concur.