2009 VT 101

### James Turner v. Roman Catholic Diocese of Burlington, Vermont

[987 A.2d 960]

No. 08-003

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed October 9, 2009

---

400

402

*Jerome F. O'Neill, John F. Evers* and *Michael I. Green* of *O'Neill Kellner & Green,* Burlington, for Plaintiff-Appellee/Cross-Appellant.

*Daniel L. Burchard* of *McCormick, Fitzpatrick, Kasper & Burchard, P.C.,* Burlington, and *Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.,* Rutland, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Dooley, J.** Defendant Roman Catholic Diocese of Burlington, Vermont appeals an adverse final judgment on the grounds that the superior court erred by (1) granting plaintiff James Turner's motion for judgment as a matter of law and setting aside the jury's finding on the statute of limitations' discovery period, (2) failing to dismiss plaintiff's claim of negligent supervision, and (3) granting a mistrial and awarding sanctions against defendant. Plaintiff cross-appeals on the ground that the court erred by empanelling a juror who is a member of the diocese. We reverse and remand.

¶ 2. The basic facts may be briefly summarized. Additional material facts will be set forth in the discussion that follows. Father Alfred Willis, a Roman Catholic priest, sexually assaulted plaintiff in June 1977 in a motel room in Albany, New York, following the ordination of plaintiff's brother as a Roman Catholic priest. Plaintiff was sixteen years old at the time. That same summer, Willis attempted to assault plaintiff again at plaintiff's parents' home in Derby, Vermont. At the time of these events, Willis was assigned to a parish under defendant's authority.

¶ 3. In 2004, plaintiff filed suit against defendant, alleging that the diocese negligently hired, trained, supervised and retained Willis.[1] The case first went to trial in June 2007, but ended in a mistrial, with the court imposing a monetary sanction on defendant for causing the mistrial. At the second trial in December 2007, the jury found that defendant negligently supervised Willis and caused him damages of $15,000, but that plaintiff sued over six years after he knew of the molestation, the resulting harm, and defendant's responsibility for such conduct. Although the jury's

---

[1] The text represents the state of the case when submitted to the jury. Plaintiff originally also sued Willis, but plaintiff settled with Willis and dropped him from the case before it went to the jury. Plaintiff also alleged that the diocese was liable on a theory of respondeat superior. This theory was abandoned in light of this Court's decision in *Doe v. Newbury Bible Church,* 2007 VT 72, 182 Vt. 174, 933 A.2d 196. Plaintiff also had other theories that never went to the jury.

finding on when plaintiff had the requisite knowledge would normally have meant that the suit was barred by the statute of limitations, the trial judge concluded that the finding lacked evidentiary support and ruled that the jury verdict on liability and damages would stand. Both defendant and plaintiff appeal.

¶ 4. Before we address the merits of the appeal, it is helpful to create a roadmap of the issues on appeal and the order in which they will be addressed. First, we address defendant's argument that it should not have been sanctioned during the first trial. Because the sanction arose out of the first trial, it is independent of the other issues in this case.

¶ 5. Second and third, we address defendant's arguments involving the First Amendment to the Federal Constitution and the statute of limitations. With respect to the First Amendment, defendant argues that the suit against it violates its rights under the Free Exercise and Establishment Clauses, and the religious autonomy doctrine under these clauses. With respect to the statute of limitations, defendant argues that the six-year statute of limitations used by the court does not apply because the requirements of the retroactivity provision are not met and that the court erred in rejecting the jury's finding that plaintiff did not sue in time under the six-year statute. Finally, we address plaintiff's cross-appeal argument that the court erred in refusing to exclude a juror for cause.

¶ 6. We start with the mistrial and imposition of sanctions. This case was first tried in June 2007, ending in a mistrial. Before the June trial, plaintiff filed a motion in limine to exclude any reference to a sexual relationship between Willis and plaintiff's brother. The trial court granted this motion, stating that "[d]efense questions about this subject are barred as being irrelevant to the case before the court." During its cross-examination of plaintiff, defendant inquired into this relationship. The court sustained numerous objections from plaintiff during the cross-examination. During a break in the trial, the trial court entertained plaintiff's motion for a mistrial and costs. At that time, defendant indicated that it wanted reconsideration of the pretrial ruling prohibiting it from showing that plaintiff's brother and Willis had a sexual relationship. The court orally granted plaintiff's motion, followed by a written ruling when plaintiff moved for the imposition of costs. The court concluded that during the cross-examination defendant's attorney "repeatedly and deliber-

ately violated the court's pre-trial ruling by asking questions which were designed to tell the jury about this relationship." The court granted plaintiff's motion for mistrial "because nothing short of a mistrial could have cured the prejudicial effects of defense counsel's repeated violation of the trial court's pre-trial ruling."

¶ 7. After the mistrial order, defendant responded to plaintiff's oral motion for imposition of costs, arguing that the cross-examination was conducted in good faith, was consistent with the court's evidentiary rulings at the time, and was justified by the introduction of plaintiff's counseling records. It further argued that the mistrial was unjustified, that there were no grounds for sanctions, and that defendant should be allowed discovery and an opportunity to be heard. The court awarded plaintiff and plaintiff's counsel approximately $112,000 to cover the attorneys' costs of trial preparation and trial and expert witness fees. It held that the award was compensatory and not punitive, but noted that the mistrial had helped defendant by enabling it to see plaintiff's case and that the mistrial was a particular hardship for plaintiff. The court characterized defense counsel's actions as "misconduct."

¶ 8. Defendant has appealed the award of costs. Specifically, defendant argues that the court erred in imposing sanctions because: (1) its questions were not intended to elicit the prohibited information; (2) the underlying decision to grant a mistrial was incorrect because there was no prejudice to plaintiff; and (3) the order that defendant violated was not "specific and definite" and left a "reasonable basis for doubt as to its meaning," because any clarity the ruling had was lost by the court's rulings from the bench during the cross-examination.

¶ 9. A mistrial can be an appropriate remedy for a violation of an order made in response to a motion in limine. *State v. Wood*, 146 Vt. 57, 57, 498 A.2d 494, 495 (1985). Further, the court has inherent power to sanction a party "to protect the integrity of the judicial system." *Lamell Lumber Corp. v. Newstress Int'l, Inc.*, 2007 VT 83, ¶ 23, 182 Vt. 282, 938 A.2d 1215. Thus, the issue is not whether the court had the power to issue the orders it did, but instead whether that power was properly exercised.

¶ 10. In addressing that issue, we must first articulate the standard of review. We review a trial court's mistrial order and the imposition of sanctions for abuse of discretion. *State v. Mears*, 170 Vt. 336, 345, 749 A.2d 600, 607 (2000); *Lamell Lumber*, 2007

VT 83, ¶ 23; see also *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991) (reviewing trial court's exercise of its inherent powers for abuse of discretion); *Arizona v. Washington*, 434 U.S. 497, 514 (1978) (trial judge's declaration of a mistrial "is entitled to great deference"). We will uphold the ruling "unless the court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable." *Mears*, 170 Vt. at 345, 749 A.2d at 607 (quotation omitted).

 ¶ 11. Drawing on contempt law, defendant argues that we should conduct a more rigorous review of the trial court's sanction order, citing *United States v. Local 1804-1, International Longshoremen's Ass'n, AFL-CIO*, 44 F.3d 1091, 1095-96 (2d Cir. 1995) (concluding that the "review of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted" because the contempt power may be used to regulate out-of-court behavior and is "among the most formidable weapons in the court's arsenal"). In distinguishing this line of cases, we note that the order here is expressly meant to be compensatory and not punitive. See *Bigelow v. Bigelow*, 171 Vt. 100, 108, 759 A.2d 67, 72 (2000) (citing favorably courts that have held that imposition of noncompensatory fines requires "enhanced due process protections"). Nevertheless, we have held that "[o]rdinarily, use of the contempt power is subject to review only for an abuse of discretion." *Hunt v. Hunt*, 162 Vt. 423, 436, 648 A.2d 843, 853 (1994). We will conduct a more careful review in certain circumstances. See, e.g., *In re Duckman*, 2006 VT 23, ¶ 7, 179 Vt. 467, 898 A.2d 734 (reviewing a court's exercise of its discretion "carefully in cases of summary contempt because in those proceedings the otherwise inconsistent functions of prosecutor, jury and judge are united in one individual" (quotation omitted)). The imposition of compensatory sanctions for costs as a result of causing a mistrial does not raise similar concerns necessitating a more rigorous review.

 ¶ 12. With this background in mind, we turn to defendant's argument that the mistrial was incorrectly declared because there was no violation of the pretrial order, as its questions were intended to reveal answers that did not disclose the sexual relationship between Willis and plaintiff's brother. While defendant's argument may be true as to some of its questions, the trial

court did not clearly err in concluding that the following questions violated the pretrial order: "Think for me today, what is it that you were aware of at that time or some years before with regard to Alfred Willis and your brother Bernard Turner that caused you to blame him for what happened to you?"; "What information did you learn, Mr. Turner, that caused you to conclude between the date of the abuse that you described and August of '04, what is it that you learned about the relationship of Father Alfred Willis and your brother Father Bernard Turner that caused you to form the opinion that he, your brother Bernard, should have protected you from this abuse?"; and "Why were you distrusting your brother? . . . Did it have anything to do with information that you had received regarding the nature of any relationship between Alfred Willis and your brother Bernard?" Thus, the court did not abuse its discretion in concluding its pretrial order had been violated.

¶ 13. Defendant next argues that the court erred because there was no prejudice to plaintiff, pointing out that the evidence regarding a sexual relationship between Willis and plaintiff's brother was never actually put before the jury, and that any evasiveness shown by plaintiff in attempting to answer defendant's questions without revealing the sexual relationship was not prejudicial because "he was evasive well before" these questions. Motions for mistrial should not be granted unless the moving party demonstrates prejudice. *Mears*, 170 Vt. at 345, 749 A.2d at 607; see also *Joslin v. Griffith*, 125 Vt. 104, 106-07, 211 A.2d 249, 251 (1965) (refusal to declare a mistrial in cases involving introduction of evidence of liability insurance coverage is appropriate if it is "apparent that the prejudicial effect will be minimal"). We find no abuse of the court's discretion in concluding that plaintiff was prejudiced by defendant's questions and that a mistrial was the appropriate remedy for this prejudice. The critical questions are set out above, and the court's conclusion that the jury would have understood there was a sexual relationship was reasonable. An order in limine "bars questioning of witnesses regarding [inadmissible] evidence" and "safeguards against the prejudicial impact resulting from asking questions and making objections before the jury regarding inadmissible evidence." *Tucker v. Division Sales, Inc.*, 734 N.E.2d 165, 169 (Ill. App. Ct. 2000). That purpose was violated here.

¶ 14. With respect to the concern about plaintiff's appearance to the jury, the trial court is in the best position to assess whether the questioning caused plaintiff to appear evasive. See *Mears*, 170 Vt. at 346, 749 A.2d at 607. Under an abuse-of-discretion standard, we do not substitute our judgment for that of the trial court, and we are unwilling to second-guess the court under these circumstances. The trial court did not withhold its discretion or act on grounds that were clearly untenable or unreasonable.

¶ 15. Our conclusion is not changed by the fact that the motion-in-limine decision was based on the court's conclusion that the evidence was not relevant, and not on a balancing of the evidence under Vermont Rule of Evidence 403. Whatever the specific ground for the evidentiary ruling, the court could consider the prejudicial impact of the evidence in determining whether to grant a mistrial.

¶ 16. On the issue of sanctions, defendant argues that sanctions are inappropriate because the order that defendant violated was not "specific and definite" and left a "reasonable basis for doubt as to its meaning." Specifically, defendant argues that any clarity the ruling had was eliminated by the court's rulings from the bench during the cross-examination. Courts have inherent power to assess expenses for consequential damages suffered by the opposing side, including attorney's fees and witness expenses, incurred due to an abuse of the judicial process. *Van Eps v. Johnston*, 150 Vt. 324, 327, 553 A.2d 1089, 1091 (1988); see also *Onstad v. Wright*, 54 S.W.3d 799, 805 (Tex. App. 2001) (violation of order in limine is grounds for sanctions). Abuse of the judicial process includes ignoring court orders and acting in bad faith. *Van Eps*, 150 Vt. at 327, 553 A.2d at 1091. For the court to take action in response to a pretrial order, the order must be specific. *Tucker*, 734 N.E.2d at 169.

¶ 17. The court's pretrial order was specific and definite; defendant had notice that questions about a sexual relationship between Willis and plaintiff's brother were prohibited. Defendant apparently believed that the pretrial order should have been modified or withdrawn. If so, its proper remedy was to approach the court and argue for reconsideration before prejudicing plaintiff's position with objectionable questions. See *City of Springfield v. Thompson Sales Co.*, 71 S.W.3d 597, 601 (Mo. 2002) (mistrial was necessary in part because plaintiff's counsel violated in limine

ruling by "comment[ing] on these issues to the jury without first approaching the bench and asking that the *in limine* ruling be reconsidered"); *Autry v. State*, 2007 OK CR 41, ¶ 17, 172 P.3d 212 ("As a matter of common sense, as well as law, the circumstances here required counsel to approach the bench to allow the Court to reconsider the negative ruling."); *Bobo v. State*, 757 S.W.2d 58, 61 (Tex. App. 1988) (explaining that even without specific direction in the in limine order, counsel was required to "approach the bench concerning proffer of evidence pertinent to the motion").

■ ¶ 18. Defendant argues that the order was modified as the court monitored the cross-examination. We are unpersuaded by this argument. First, the court's rulings from the bench are not an answer to defendant's obligation to seek reconsideration before asking objectionable questions, especially after plaintiff clearly insisted on enforcement of the pretrial order and the court began to sustain plaintiff's objections. Second and related, while the court retains the right to change its pretrial rulings, see *State v. Amidon*, 2008 VT 122, ¶ 15, 185 Vt. 1, 967 A.2d 1126, a close reading of the transcript shows that the trial court did not do so. Defendant specifically identifies the following exchange as showing that the court modified its ruling:

> Q: On 8-19-04, what were you aware of about your brother Bernard Turner and his very close friend Alfred Willis?
>
> Plaintiff's Attorney: Objection, Your Honor.
>
> Court: That's . . . a possibly leading question and is permissible under cross-examination.
>
> Plaintiff's Attorney: Your Honor, I think this relates substantively to a topic that you have already addressed for trial.
>
> Court: Well . . . when we get to that point, believe me, I'll . . . listen to another objection.
>
> Plaintiff's Attorney: I think we're there, Judge.
>
> Court: Well, we may be, we may not be. I'm going to permit it. Go ahead.

We agree that the court did not immediately see where defendant's questions were going, and the initial evidentiary rulings did not close the door on defendant's questions. We do not agree,

however, that the court contradicted or repudiated its pretrial order, nor do we find such a contradiction in any of the other evidentiary rulings. As defendant's direction became clearer, and plaintiff's objections became more specific, the court sustained objections to the questions.

 ¶ 19. This record demonstrates why, generally, the proponent seeking to introduce evidence blocked by a pretrial ruling must seek modification or reversal of the prior ruling. As defendant's line of questioning began, it was not immediately apparent where the cross-examination was going — the questions did not ask directly if there was a sexual relationship between Willis and plaintiff's brother. The parties' lawyers are more aware than the judge of expected answers to questions.[2] Moreover, the court has a right to expect that counsel is abiding by the pretrial ruling and not trying to induce the court to mistakenly repudiate it. In essence, the court ultimately concluded that defense counsel had sought such a mistaken repudiation. We do not read any of the court's other trial rulings as modifying its pretrial ruling.

 ¶ 20. Defendant argues that it did not know it was risking a mistrial and sanctions. As discussed above, defendant disobeyed the court's order. The trial court had no obligation to specifically warn defendant that such a violation may result in a mistrial and sanctions. As we have held above, the court had the power to declare a mistrial and impose sanctions for violation of the pretrial order, and lawyers are expected to know of this power. For the above reasons, we hold that the superior court acted within its authority in declaring a mistrial and imposing a compensatory sanction on defendant. We affirm the court's action.

¶ 21. We next address defendant's argument that the trial court erred in failing to grant defendant's motion for summary judgment based on the First Amendment to the Federal Constitution.[3] To put the argument in perspective and establish a standard of review, we recount the record in the trial court.

---

[2] A clear example of this occurred during the cross-examination. Defense counsel asked plaintiff about a visit from his brother in connection with a meeting the brother was attending. He specifically asked about the purpose of the meeting. Plaintiff's answer was evasive. In fact, it was a meeting of gay priests, a fact the trial judge would not have known.

[3] The diocese has not argued that plaintiff's lawsuit would violate the Vermont Constitution, and as a result, we do not consider this issue.

¶ 22. In May 2007, before the first trial in this case, defendant moved for summary judgment, or in the alternative, a judgment as a matter of law under Vermont Rule of Civil Procedure 50. It argued, among other claims, that any imposition of liability on defendant would violate both the Free Exercise and the Establishment Clauses of the First Amendment to the Federal Constitution.[4] The motion was accompanied by a statement of undisputed facts containing the basic facts of this case. Although plaintiff filed a statement of disputed facts in response, he did not respond directly to the motion for summary judgment or to defendant's First Amendment claims. The court did not decide the summary judgment motion either before the first trial or before the second trial. At the close of plaintiff's case in the second trial, defense counsel argued that liability would violate the First Amendment, stating: "this is an unnecessary complication and involvement of the courts with the church's First Amendment rights."[5] The court responded that it was "just using neutral principles of civil law [so] there's no improper First Amendment entanglement with religion." This is the only ruling on the merits of defendant's argument. Defendant failed to renew the motion post-trial as required by Rule 50(b). Inexplicably, after the jury charge was delivered, defendant objected to the jury instruction on liability as a "violation of the First Amendment." The court did not modify the instruction after the objection, ruling the objection had nothing to do with the charge language.

¶ 23. The only decision we can review, if we can call it that, is the decision not to grant the motion for summary judgment. We review an appeal from a trial court's denial of summary judgment de novo. *Concord General Mut. Ins. Co. v. Woods*, 2003 VT 33, ¶ 5, 175 Vt. 212, 824 A.2d 572. Summary judgment should be granted

---

[4] As we express in other parts of this opinion, we are frustrated by the failure of the parties to include key documents in the printed case, to specify what rulings are on appeal, and to explain how the appeal arguments have been preserved. In this instance, the motion for summary judgment is not in either printed case, nor are the objections to the jury instructions or the motion for judgment as a matter of law. Defendant has not specified what ruling we are reviewing, and has failed to describe how it has preserved its arguments.

[5] The statement was made as part of defendant's motion for judgment as a matter of law, which argued that plaintiff had failed to establish a "legally sufficient evidentiary basis for a reasonable jury" to find that it had been negligent and was therefore liable. V.R.C.P. 50(a)(1). The court ruled against defendant, thus allowing the case to go to the jury. Defendant has not appealed that ruling.

only where there are no genuine issues of material fact and any party is entitled to judgment as a matter of law. *Id.*; V.R.C.P. 56(c). In this case, while there are extensive disputes over the facts, none of these disputes are particularly relevant to this issue. Defendant has argued the issue based on the allegations and theories of liability in plaintiff's complaint. Thus, as the claim is presented to us, our review is functionally equivalent of that for denial of a motion to dismiss for failure to state a claim on which relief can be granted under Vermont Rule of Civil Procedure 12(b)(6). See *Powers v. Office of Child Support*, 173 Vt. 390, 395, 795 A.2d 1259, 1263 (2002) (Rule 12(b)(6) motion should not be granted "unless it is beyond doubt that there exist no facts or circumstances that would entitle [plaintiff] to relief").

¶ 24. We set out the record and standard of review to emphasize what is not before us. In its memorandum of law to the superior court, and to a lesser extent in its brief to this Court, defendant has set forth doctrine from religious sources, including the Bible, to explain why applying tort standards would burden the free exercise of its religion. We are not inclined to enter a dispute over religious doctrine based on arguments of lawyers. To the extent these sources are relevant, they must be offered by traditional methods of proof.

¶ 25. Defendant argues that allowing plaintiff to pursue a negligent hiring claim against it would violate the Free Exercise Clause because in order to assess the reasonableness of defendant's decision to ordain Willis, the court has to pass judgment on an ecclesiastical decision. Defendant further argues that allowing plaintiff to pursue a negligent supervision claim transgresses both the Free Exercise and Establishment Clauses and the religious autonomy doctrine because the supervision of clergy is inextricably rooted in religious doctrine and belief.

¶ 26. The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The prohibitions contained in the First Amendment apply to the states by operation of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

¶ 27. The Free Exercise Clause guarantees the freedom to hold religious beliefs and the freedom to act in accordance with those beliefs. *Id.* However, the freedom to act in accordance with

religious beliefs is not absolute. *Id.* at 303-04 ("Conduct remains subject to regulation for the protection of society."). To be protected under the Free Exercise Clause, the conduct that the state seeks to regulate must be "rooted in religious belief." *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972). Laws that are neutral and of general applicability do not violate the Free Exercise Clause. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."); *Employment Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 878-82 (1990) (stating that, unless the state attempts to regulate religious beliefs, the communication of religious beliefs, or the raising of one's children in those beliefs, the Free Exercise Clause does not bar neutral, generally applicable laws).[6]

■■■ ¶ 28. We reject defendant's Free Exercise Clause argument. Defendant does not argue that the common law of negligence is something other than a neutral law of general applicability or that it is directed specifically towards a religious belief or practice of defendant. Nor has defendant identified a specific doctrine or practice that will be burdened if plaintiff's suit goes forward. We do not believe defendant's generalized assertion that requiring it to hire and supervise priests in a nonnegligent manner would constitute undue interference in church governance.

---

[6] To counter the Free Exercise Clause standard announced in *Smith,* Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488 (codified at 5 U.S.C. § 504, 42 U.S.C. §§ 1988, 2000bb to 2000bb-4). Congress's stated purpose in enacting the RFRA was "to restore the compelling interest test as set forth in Sherbert v. Verner and Wisconsin v. Yoder and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1) (citations omitted). Four years after the enactment of RFRA, the Supreme Court invalidated the RFRA as applied to the states. *City of Boerne v. Flores,* 521 U.S. 507, 529, 536 (1997) (noting that under the Fourteenth Amendment the federal government did not have the power to substantively alter constitutional rights). Therefore, the standard articulated by the Supreme Court in *Smith* remains the relevant standard for evaluating whether plaintiff's negligence claims violate the Free Exercise Clause. See *Office of Child Support, ex. rel. Stanzione v. Stanzione,* 2006 VT 98, ¶ 10 n.1, 180 Vt. 629, 910 A.2d 882 (mem.) (stating that *Hunt v. Hunt,* 162 Vt. 423, 648 A.2d 843 (1994), decided during the RFRA's brief application to the states, was inapposite to the extent the decision depended upon the stringent RFRA test).

¶ 29. Defendant has further argued that *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952), and *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), prohibit secular courts from ruling upon matters of clergy selection. We decline to interpret either case as requiring such a broad construction of its holding. Requiring defendant to comply with a generally applicable secular law by nonnegligently hiring and supervising priests is not the equivalent of the state statute in *Kedroff* that transferred the control of certain churches from one central governing hierarchy to another. 344 U.S. at 107 (holding that a state statute that determined a dispute over the control of Russian Orthodox churches in New York was unconstitutional because the statute prohibited the free exercise of religion). Nor does the resolution of the case before us require applying church doctrine as in *Serbian E. Orthodox Diocese*, 426 U.S. at 708-09 (holding that the Free Exercise Clause prohibits civil interference in the allocation of hierarchical authority within a church as directed by the church's governing documents).

¶ 30. In reaching this decision, we are following many precedents from other courts which reached the same conclusion in similar circumstances. See *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431-32 (2d Cir. 1999); *Doe v. Norwich Roman Catholic Diocesan Corp.*, 268 F. Supp. 2d 139, 144-46 (D. Conn. 2003); *Moses v. Diocese of Colorado*, 863 P.2d 310, 320-21 (Colo. 1993); *Malicki v. Doe*, 814 So. 2d 347, 360-63 (Fla. 2002) (collecting cases); *Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶¶ 49-54, 871 A.2d 1208; *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213 (Miss. 2005) (en banc) (collecting cases in Appendix A). While there are others that reach the opposite conclusion, we do not find these persuasive.

¶ 31. We turn now to the Establishment Clause, which prohibits government action that tends to endorse, favor, or in some manner promote religion. See *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-49 (2002). In *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), the Supreme Court announced a three-prong Establishment Clause test: (1) governmental action must have a secular purpose; (2) its primary effect must not enhance or inhibit religion; and (3) the action must not foster an excessive government entanglement with religion. In evaluating whether a law that is religiously neutral on its face violates the Establishment Clause,

we must inquire if the law has either the purpose or principal effect of advancing or inhibiting religion. *Zelman*, 536 U.S. at 648-49. Whether there is excessive government entanglement with religion is a factor to consider in evaluating whether the principal effect of the governmental action is to advance or inhibit religion. *Agostini v. Felton*, 521 U.S. 203, 232 (1997); see also *Zelman*, 536 U.S. at 648-49; *id.* at 668 (O'Connor, J., concurring); *Mitchell v. Helms*, 530 U.S. 793, 807 (2000) (plurality opinion). Not all "entanglements" are constitutionally proscribed. *Chittenden v. Waterbury Ctr. Cmty. Church, Inc.*, 168 Vt. 478, 487, 726 A.2d 20, 26 (1998). Excessive entanglement between church and state may occur when governmental regulation necessitates an examination of religious doctrine or results in a close surveillance of religious institutions. *Hernandez v. Comm'r*, 490 U.S. 680, 696-97 (1989); see also *Lemon*, 403 U.S. at 615 (instructing that an excessive entanglement inquiry should "examine the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority").

¶ 32. Defendant does not contend that a judicial inquiry into the negligent supervision claim serves any purpose other than a secular purpose, or that such an inquiry has as its primary effect the endorsement or inhibition of religion. Rather, defendant argues that there is excessive entanglement because the "supervision of clergy is inextricably rooted in religious belief" and that such an inquiry would require an examination of the religious doctrine of the Catholic Church. There is no excessive entanglement because the negligence claim is not measured against canon law, but rather against secular legal standards. To prevail, plaintiff had to prove that he was owed a duty, the duty was breached, and he suffered damages that were caused by the breach. Common law, not ecclesiastical principles, establishes the scope of that duty. The duty owed by defendant to protect minors from sexual abuse is not different from the duty owed by other institutions to which the common law applies. We find that there was no excessive entanglement, and thus, no violation of the Establishment Clause. Again, we note that many other courts have reached the same result in similar circumstances. See *Martinelli*, 196 F.3d at 431; *Doe*, 268 F. Supp. 2d at 145-46; *Smith v. O'Connell*, 986 F. Supp. 73, 80-82 (D.R.I. 1997); *Malicki*, 814 So. 2d at 363-64; *Konkle v.*

*Henson,* 672 N.E.2d 450, 454-56 (Ind. Ct. App. 1996); *Roman Catholic Diocese of Jackson,* 905 So. 2d at 1229-30.

¶ 33. Finally, defendant argues that plaintiff's suit violates the religious autonomy doctrine,[7] as recognized by the U.S. Supreme Court in *Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1871). In *Watson,* the Court declined jurisdiction over a property dispute between two factions within a church that had already been adjudicated by the highest Presbyterian church authorities, stating:

> Each [church] has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own.

*Id.* at 729. The Court later characterized this doctrine as a constitutional imperative. *Kedroff,* 344 U.S. at 116. This doctrine bars courts from becoming too closely involved in the internal, ecclesiastical matters of religious institutions. See *Serbian E. Orthodox Diocese,* 426 U.S. at 708-09; *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449-50 (1969). Sitting alone as a circuit justice, Justice Rehnquist later addressed the attempted application of the religious autonomy doctrine to secular disputes involving a church, as opposed to internal, ecclesiastical disputes, stating:

> There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes. But this Court never has

---

[7] This doctrine has been called by various names, such as the "church autonomy" or "ecclesiastical abstention" doctrine. See *Roman Catholic Diocese of Jackson,* 905 So. 2d at 1235. Further, the analysis of this doctrine often is intertwined with a discussion of the Establishment Clause or the Free Exercise Clause. See, e.g., *Bryce v. Episcopal Church in Diocese of Colo.,* 289 F.3d 648, 655-56 (10th Cir. 2002); *Malicki,* 814 So. 2d at 363-64.

suggested that those constraints similarly apply outside the context of such intraorganization disputes. Thus *Serbian Eastern Orthodox Diocese* and the other cases cited by applicant are not in point. Those cases are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged. As the Court stated in another context: "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public."

*General Council on Fin. & Admin. v. Cal. Super. Ct.*, 439 U.S. 1369, 1372-73 (1978) (citations omitted). The threshold inquiry is whether the underlying dispute is a secular one, capable of review by a secular court, or an ecclesiastical one about "discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) (quoting *Serbian E. Orthodox Diocese*, 426 U.S. at 713).

■ ■ ¶ 34. Consistent with *General Council*, we do not read the religious autonomy doctrine to require a blanket protection of a church from any and all accountability in secular courts. This case is not an intrachurch dispute; the claim was not brought under church law, nor did it seek to enforce the duties of defendant according to religious beliefs. This case was litigated to a jury verdict without, appropriately, inquiry into the validity of religious doctrine. See *Serbian E. Orthodox Diocese*, 426 U.S. at 709 (noting that courts that probe too deeply into the allocation of power within a hierarchical church violate the First Amendment in much the same manner as civil determination of religious doctrine). Further, defendant did not invoke any religious doctrine in defense of its actions, nor does it claim that the reason it failed to act in a nonnegligent manner was because of a religious belief or practice. See, e.g., *Bryce*, 289 F.3d at 657. In these circumstances, the religious autonomy doctrine does not shield a church from accountability for its negligent actions. See *Martinelli*, 196

F.3d at 431-32; *Nielsen v. Archdiocese of Denver*, 413 F. Supp. 2d 1181, 1184-85 (D. Colo. 2006); *Malicki*, 814 So. 2d at 363-64; *Roman Catholic Diocese of Jackson*, 905 So. 2d at 1235-37.

¶ 35. For the above reasons, we reject defendant's First Amendment arguments. In doing so, we find persuasive and follow the majority of decisions that have addressed similar arguments.

¶ 36. We next address defendant's argument regarding the applicable statute of limitations. Defendant appears to make two claims on appeal: (1) because it cannot be applied retroactively, the six-year statute of limitations for child sexual abuse does not apply to plaintiff's claims as a matter of law, and (2) the trial court erred by granting plaintiff's motion for judgment as a matter of law and setting aside the jury's findings on the statute of limitations' discovery period.

¶ 37. In 1990, the Vermont General Assembly adopted a statute of limitations for childhood sexual abuse cases, which provides:

> A civil action brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within six years of the act alleged to have caused the injury or condition, or six years of the time the victim discovered that the injury or condition was caused by that act, whichever period expires later. The victim need not establish which act in a series of continuing sexual abuse or exploitation incidents caused the injury.

12 V.S.A. § 522(a). The statute includes a retroactivity provision that applies § 522(a) to "all causes of action commenced on or after the effective date of this act, so long as either the act of sexual abuse or the discovery that the injury or condition was caused by the act of sexual abuse occurred on or after July 1, 1984." 1989, No. 292 (Adj. Sess.), § 4(b) (effective July 1, 1990). If § 522 does not apply, a three-year limitations period applies. 12 V.S.A. § 512(4).

¶ 38. In May 2007, before the first trial, defendant moved for summary judgment and for judgment as a matter of law, arguing that plaintiff's action was barred by the statute of limitations. The alleged sexual abuse in this case occurred in 1977, and suit was brought in September 2004. Defendant argued that because plaintiff was aware the abuse occurred when Willis inflicted it on him, and because he discussed the abuse with his mother and

brother in 1981, plaintiff was aware that the sexual abuse caused his "injury or condition" no later than 1981. Since that date was before July 1, 1984, defendant argued that the retroactivity provision did not apply as a matter of law. Defendant further argued that the discovery of the injury also triggered the applicable three-year limitations period, so that it expired long before the action was filed, barring the action. Defendant similarly noted that even a six-year period expired long before the action was filed. Finally, defendant acknowledged that under the six-year rule, the date of accrual might commence when plaintiff discovered that defendant was potentially liable, but argued that plaintiff had that information well before 1998.

¶ 39. Plaintiff responded to the motion largely relying upon plaintiff's statements made during discovery that he was unaware that his mental health problems were caused by the sexual abuse until 2002. He asserted that the six-year limitations period applied and that he had not discovered the cause of his mental health problems or the potential liability of defendant until after 1998.

¶ 40. It appears that the court never ruled on defendant's motion prior to the close of the first trial.[8] After the mistrial, defendant sought a ruling from the new presiding judge, and the court issued a decision denying the motion for summary judgment because of disputed issues of fact as to when plaintiff discovered the cause of his injury and the potential responsibility of defendant. The court concluded that the application of both § 522 and the retroactivity provision depended upon when plaintiff discovered or should have discovered (1) the wrongful act; (2) that the injury was caused by the act; and (3) the existence of a cause of action against defendant. The trial court stated:

> This action was commenced September 2, 2004. We therefore expect to pose the limitation issue to the jury as whether defendant has persuaded it that, probably, plaintiff should have discovered the\ elements of his case prior to September 2, 1998. If, as defendant may argue, plaintiff should have, or actually did, discover them prior

---

[8] Again, we are frustrated by limitations in the record provided by defendant and in the printed cases. Neither defendant's motion, nor plaintiff's response, is in either of the printed cases. Defendant has not informed us in its brief how it preserved the arguments it is making to us, and as we decide *infra*, some are unpreserved, at least in the record before us.

to July 1, 1984, thereby vitiating retroactivity of § 522, the posed question will have necessarily been answered as well.

¶ 41. At the close of plaintiff's case, defendant moved unsuccessfully for judgment as a matter of law with respect to the statute of limitations. Both parties so moved at the close of the evidence. The court delivered instructions and interrogatories consistent with the instructions to the jury. There were no relevant objections to these instructions. The third interrogatory directed the jury to determine whether defendant had or had not "proved its claim that plaintiff Turner knew of, or should have known of, his molestation by Alfred Willis, resulting harm, and responsibility of the diocese for such conduct by Willis some time before September 2, 1998." The jury answered that defendant had proved its claim. Following that verdict, plaintiff again moved for judgment as a matter of law, arguing that there was no evidence to support the jury's finding that plaintiff knew, or should have known, of the responsibility of defendant before September 2, 1998. Defendant responded that the jury could make that finding based on plaintiff's brother's 1981 statement to him that Willis had been caught molesting children.

¶ 42. The trial court granted plaintiff's motion. The court noted that the brother's statement to plaintiff lacked specifics — there was no evidence as to where the brother learned this information and nothing indicated that he learned it from defendant. It reasoned that "knowing a priest breached a duty does not, per se, tip off the reasonable person that the diocese had also breached a duty." The court held that some "additional quantum of information is needed for a negligent supervision claim to accrue" and that the brother's statement to plaintiff was not sufficient. Accordingly, it concluded that no evidence supported the jury verdict that plaintiff knew, or should have known, of defendant's responsibility for Willis's conduct at some time prior to September 2, 1998.

¶ 43. Defendant first challenges the trial court's conclusion that the six-year limitations period applies. Specifically, defendant argues that the six-year limitations period can apply only as a result of the § 522 retroactivity provision and that this provision does not apply to this case because plaintiff knew that Willis's act of sexual abuse caused his mental injury before 1984. While we

accept the logic of this argument, we find that it was largely unpreserved. Under the trial court's instruction to the jury, and the interrogatory, the jury never was required to determine when plaintiff knew or should have known that Willis's abuse caused his harm. Defendant did not object to the jury instruction or the interrogatory on this point. Thus, the instruction became the governing law, and defendant cannot argue in this Court that the jury should have made this determination.[9] See *Lemnah v. Am. Breeders Serv., Inc.*, 144 Vt. 568, 573, 482 A.2d 700, 703 (1984). At best, defendant can argue based on its summary judgment and Rule 50 motions that as a matter of law plaintiff knew, or should have known, before July 1, 1984 that his injury was caused by Willis's sexual abuse. It does make that argument here, asserting that the sexual abuse had an immediate negative impact on plaintiff and he always remembered the abuse and its impact.

■ ¶ 44. In evaluating this argument, we note that the discovery rules in the § 522 limitations statute and in the retroactivity provision are different. We addressed this question in *Earle v. State*, 170 Vt. 183, 743 A.2d 1101. In that case, the plaintiff brought an action against the Vermont Department of Social and Rehabilitation Services (SRS), claiming that SRS's negligence allowed him to be sexually abused by an older boy in SRS custody. We concluded that the trial court erred in equating the date that the cause of action accrued under the statute of limitations with the date of discovery that determines whether a plaintiff's claim falls within the retroactivity period:

> [T]he date of accrual under the statute of limitations and the date of discovery under the retroactivity provision cannot be equated because they are determined by different acts. The statute of limitations hinges upon "the act alleged to have caused the injury or condition." In

---

[9] Because this case will be remanded, and to avoid the repetition of an error, we note that the jury instruction improperly conflated the standard for determining whether the retroactivity provision applied with the standard for applying the six-year limitations statute. As we said in *Earle v. State*, 170 Vt. 183, 191 n.4, 743 A.2d 1101, 1107 n.4 (1999), these standards "cannot be equated because they are determined by different acts." Under the court's jury charge, the jury never determined whether the discovery of plaintiff's injury or condition occurred on or after July 1, 1984 as required by the retroactivity provision. Our conclusion that the instruction was erroneous does not help defendant because it did not object to this instruction.

> *Sabia,* we clarified that the word "act" in this context may refer to the alleged act of negligence by a third party.' The act at issue here is SRS's allegedly negligent failure to prevent N.C. from abusing plaintiff. The cause would not accrue, however, until plaintiff had reason to know that SRS may have been negligent. In contrast, the retroactivity provision hinges upon "the act of sexual abuse or the discovery that the injury or condition was caused by the act of sexual abuse." The retroactivity provision is triggered only by the act of abuse or the discovery of an injury caused by that abuse.

*Id.* at 191 n.4, 743 A.2d at 1107 n.4 (emphasis and citations omitted). Thus, plaintiff's understanding of defendant's potential culpability "is irrelevant to the question of retroactivity." *Id.*

■ ¶ 45. *Earle* also addresses how we apply the retroactivity provision's discovery rule to determine when plaintiff knew or should have known of the injury and its cause. In *Earle,* defendant made the same argument that defendant makes here — that plaintiff has an immediate injury from the abuse and knows of its source so that no discovery is necessary. Acknowledging that we cannot allow a new accrual date for the cause of action every time "a new condition is discovered," we nevertheless held that the Legislature "intended courts to look at something more than just the date of sexual abuse." *Id.* at 190, 743 A.2d at 1106. We held that the statute "directs us to consider the date when such abuse was linked to a psychological effect as an event that may bring a case within the retroactive application of the statute." *Id.* Thus, we held that the immediate and long-term effects of child sexual abuse are "separate occurrences," each with its own occurrence time for purposes of the retroactivity provision. *Id.* at 191, 743 A.2d at 1106.

■ ¶ 46. In this case, plaintiff sought damages for the long-term adverse effects. Plaintiff's deposition that was before the court in connection with defendant's motion for summary judgment indicates that plaintiff first linked his long-term mental health issues to Willis's conduct in 2002 or 2004, well after the 1984 cut-off date in the retroactivity provision. Plaintiff's trial testimony was similar. While defendant can point to other evidence that may support its view that plaintiff was aware or should have been aware much earlier, at best there is a genuine issue of

material fact that precluded grant of summary judgment, see V.R.C.P. 56(c)(3), and there was a legally sufficient basis for the jury to find for plaintiff on the issue, see V.R.C.P. 50(a)(1). Thus, the trial court did not err in denying defendant's Rule 50 motions, and defendant was not entitled to summary judgment.

¶ 47. We now turn to defendant's argument that the trial court erred by granting plaintiff's post-trial motion for judgment as a matter of law, applying the six-year limitations period to the facts of this case and setting aside the jury's findings as to when plaintiff knew or should have known of defendant's responsibility. Under the jury charge, defendant had the burden of showing that plaintiff "knew of, or should have known of, his molestation by Alfred Willis, resulting harm, and responsibility of the diocese for such conduct by Willis some time before September 2, 1998." There were three parts to defendant's burden, and plaintiff argued that there was no evidence in the record to support a finding on the third part of the statutory test — that plaintiff knew or should have known of defendant's responsibility for Willis's conduct. The court granted plaintiff's motion after reviewing the evidence that defendant identified as supporting the jury's finding.

¶ 48. We review the entry of judgment as a matter of law under the same standard as the trial court. *Gero v. J.W.J. Realty*, 171 Vt. 57, 59, 757 A.2d 475, 476 (2000). Judgment as a matter of law may be granted where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party." V.R.C.P. 50(a)(1). We view the evidence "in the light most favorable to the nonmoving party, and we exclude the effects of any modifying evidence." *Gero*, 171 Vt. at 59, 757 A.2d at 476. While the determination of when a claim accrues is generally a question reserved for the trier of fact, *Agency of Natural Resources v. Towns*, 168 Vt. 449, 454, 724 A.2d 1022, 1025 (1998), under V.R.C.P. 50(a), it is appropriate for a court to determine the issue when there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on that issue.

¶ 49. Defendant contends that there was sufficient evidence to support the jury finding that plaintiff reasonably should have known that defendant may have been negligent and been liable for plaintiff's harm. It identifies the following evidence as support for the jury's findings: (1) plaintiff was aware at the time of the abuse that Willis was a priest in the diocese; (2) plaintiff testified that his brother advised him in 1980 or 1981 that Willis had sexually

abused other boys; (3) in 1980 or 1981, or shortly thereafter, the fact that Willis was no longer employed by defendant "was open" to plaintiff; and (4) the alleged molestation of two boys by Willis while assigned to a Milton parish became public in 1981.

¶ 50. In looking at defendant's evidentiary list, particularly the first item, we need to delve more deeply into the discovery rule standard. Defendant stresses that the question is not whether plaintiff has enough information to know he has a case against defendant, but whether he has enough information to put him on inquiry notice to investigate whether he has a case. Defendant relies particularly on our decision in *Rodrigue v. VALCO Enterprises, Inc.*, 169 Vt. 539, 726 A.2d 61 (1999) (mem.). *Rodrigue* was a dram shop act case against a restaurant which served alcohol to a patron who, while intoxicated, drove his vehicle into the plaintiff's vehicle, causing injury. The applicable limitations period was two years, and the plaintiff sued two years and three months after the accident and over two years after the plaintiff knew the extent of his injuries, the name of the other operator, that the operator had been charged with driving under the influence, and that the defendant restaurant had served alcohol to the operator. He argued that under the discovery rule the action did not accrue until he also learned that the operator had been overserved by the defendant. We noted that the "plaintiff need not have an airtight case before the limitations period begins to run" and that "[f]leshing out the facts will occur during investigation of the matter or during discovery after the lawsuit is filed." *Id.* at 541, 726 A.2d at 63. We stressed that the standard for the discovery rule is whether the plaintiff discovered or should have discovered "both the injury and the fact that it *may* have been caused by the defendant's negligence or other breach of duty." *Id.* (quotation omitted). Defendant argues that just as the plaintiff in *Rodrigue* did not have to discover the overserving before the action accrued, plaintiff in this case did not have to know the actions or inaction of defendant with respect to Willis. In defendant's view, the fact that defendant employed Willis, when coupled with the disclosure that Willis had abused other children and was no longer employed by the church, put plaintiff on inquiry notice that defendant may have been responsible.

¶ 51. Defendant's argument is supported by many decisions from other jurisdictions. See *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 773 (D.C. 1998); *Zumpano v. Quinn*, 849 N.E.2d 926,

930 (N.Y. 2006); *Doe v. Archdiocese of Cincinnati*, 2006-Ohio-2625, ¶ 34, 849 N.E.2d 268 (holding under discovery rule action against the diocese accrues as a matter of law when plaintiff knows that he is assaulted by a priest and the priest is an employee of the diocese); *One Star v. Sisters of St. Francis*, 2008 SD 55, ¶ 35, 752 N.W.2d 668; *Doe v. Catholic Bishop*, No. W2007-01575-COA-R9-CV, 2008 WL 4253628, at **8-11 (Tenn. Ct. App. Sept. 16, 2008) (discussing cases).[10] These cases hold that as a matter of law a plaintiff is on inquiry notice of the potential liability of the church, or its leadership, when the plaintiff knows of the identity of the perpetrator and that the perpetrator is a subordinate representative of the church.

¶ 52. As with defendant's other arguments with respect to the limitations period, this one is partially answered by *Earle*, and the ruling in *Earle* suggests that we cannot adopt the majority rule from other states here. As noted, in *Earle*, the plaintiff was sexually assaulted as a child by another child who had been placed by SRS as a foster child in the home of the plaintiff's grandparents. Alleging that the assaults occurred before and after SRS was first notified of them, the plaintiff sued SRS for failure to prevent the assaults and for failing to intervene after the assaults were reported. SRS moved to dismiss the action as time-barred, relying on *Rodrigue* and arguing that the action accrued when the plaintiff was sexually assaulted because he was on inquiry notice that SRS breached a duty to him to prevent the abuse. We rejected that argument, observing that "absent the

---

[10] Defendant also cites another line of cases that supports its argument that the statute of limitations applicable to the suit against it commenced to run on the date of Willis's sexual assault of plaintiff. In *Doe v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 36, 734 N.W.2d 827, cited by defendant, the Wisconsin Supreme Court decided that a negligent supervision cause of action against a diocese is derivative of the underlying sexual molestation by the priests, and therefore, the negligent supervision claim accrued as a matter of law at the time of the last incident of sexual assault. We do not view an action based on negligent supervision as derivative of the underlying tort in this context. In *Brueckner v. Norwich University*, 169 Vt. 118, 126, 730 A.2d 1086, 1093 (1999), we adopted the cause of action of negligent supervision based on Restatement (Second) of Agency § 213 (1958), citing *Mainella v. Staff Builders Industrial Services, Inc.*, 608 A.2d 1141, 1145 (R.I. 1992), for the position that it involves "an entirely separate and distinct type of liability." The limitations period begins to run when "a plaintiff should have discovered the basic elements of a cause of action: an injury caused by the negligence or breach of duty of a particular defendant." *Earle*, 170 Vt. at 193, 743 A.2d at 1108.

information that SRS knew about the abuse, there was little more than bold speculation that SRS had any responsibility for plaintiff's injuries." *Earle*, 170 Vt. at 193, 743 A.2d at 1108. We held that "the existence of any duty at all was not apparent to plaintiff at the time his injuries were inflicted" because he did not know of SRS's knowledge when the abuse occurred, and we ruled that the action did not accrue when the abuse occurred. *Id.* Just as in *Earle* — where the fact that the perpetrator of the sexual abuse was in SRS custody did not alone put the plaintiff on inquiry notice of the possible liability of SRS — plaintiff here was not on inquiry notice solely from the fact that defendant employed Willis.

¶ 53. Furthermore, we have concerns that the majority rule from other states is unrealistic given the limitations on plaintiff's ability to discover necessary evidence. The trial judge in the instant case noted that defendant was hardly forthcoming about the sexual activity of its priests, making it difficult for plaintiff to determine the action or inaction of defendant.[11] Moreover, plaintiff could not have gleaned facts from the discovery process because, as we held in *Doe v. Newbury Bible Church*, 2007 VT 72, ¶ 8, plaintiff could not sue defendant on a respondeat superior theory of liability.[12] Thus, if plaintiff's complaint was based solely on Willis's position as a priest, we doubt that a claim based on negligent hiring or supervision could have withstood the standard that it have evidentiary support or be "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." V.R.C.P. 11(b)(3). Therefore, there appears to be a disconnect between what plaintiff would be charged with discovering and what he actually could discover. See *Doe v. Catholic Bishop*, 2008 WL 4253628, at *16.

¶ 54. There are further factual distinctions that persuade us not to adopt the rule that a plaintiff is on inquiry notice as a matter of law of a claim against a church if he knows that the

---

[11] In response to a memorandum filed by defendant in support of its motion for summary judgment on the statute of limitations issue, plaintiff asserted on the eve of the second trial that defendant had fraudulently concealed its involvement in Willis's hiring and supervision such that the statute was tolled under 12 V.S.A. § 555. Plaintiff failed to preserve this position below by not objecting to the jury charge, which did not require the jury to decide whether § 555 applied. Plaintiff has not raised the issue of fraudulent concealment on appeal.

[12] We recognize that *Doe* was decided in 2007, but we doubt that a respondeat superior claim would have withstood a motion to dismiss even before that time.

perpetrator is a priest in the employ of the church. *Cevenini* and *Doe v. Catholic Bishop* held that this rule applied where the church assigned the priest to the location in which plaintiff was abused and the priest was acting as a representative of the church at the time. *Cevenini*, 707 A.2d at 773; *Doe*, 2008 WL 4253628, at **16-17. As *Doe* explains, in such a situation, plaintiff must ascertain facts from the church and, if necessary, sue the priest and use discovery from the priest to make a case against the church. 2008 WL 4253628, at *17. We note that these cases are distinguishable from the present case in that here, the sexual abuse never occurred on church premises, nor were plaintiff and Willis together in the motel room in Albany or at plaintiff's parents' house due to any action of defendant. Moreover, Willis was not acting as a representative of the church at the time of the abuse.

 ¶ 55. By contrast, in *Doe*, the incidents of abuse "continued through [the plaintiff's and the defendant's] contacts at school and church," and in *Cevenini*, the defendant abused the plaintiff on several occasions at the church. *Cevenini*, 707 A.2d at 770; *Doe*, 2008 WL 4253628, at *2. And in both *Cevenini* and *Doe*, the defendants were acting in their respective capacities as church representatives at the time at least some of the abuse occurred. *Cevenini*, 707 A.2d at 770; *Doe*, 2008 WL 4253628, at *2. Given these differences, as well the holding in *Earle* and the barrier created by requiring plaintiff to obtain information he cannot realistically obtain, we decline to follow the decisions that hold that a plaintiff is, as a matter of law, on inquiry notice of the potential liability of a defendant based on the knowledge that the perpetrator was a priest in the employ of a church.

¶ 56. The issue before us, however, is different. The trial court did not rule that defendant had shown plaintiff was on inquiry notice as a matter of law, but instead ruled that plaintiff was *not* on inquiry notice as a matter of law. The middle ground is, of course, the position the trial court originally held — that the issue should be decided by the jury. We note that to the extent there are decisions that do not follow the majority rule, as discussed above, these decisions hold that the question of when a plaintiff is on inquiry notice should be decided by the jury. See *Matthews v. Roman Catholic Diocese of Pittsburgh*, 67 Pa. D. & C.4th 393, 406 (2004). As noted, *Earle* is against the majority rule, but not inconsistent with this middle ground that the issue should be

submitted to the jury. Unlike *Earle,* this case does not turn on defendant's knowledge of a single fact that is essential to liability against defendant.

¶ 57. We conclude that in this case there were sufficient facts for the jury to find in defendant's favor and that the trial court erred in deciding the issue as a matter of law. The cases following the majority rule are based on the circumstance that the abusing priest is known to be employed by a diocese. See, e.g., *Cevenini,* 707 A.2d at 773; *Doe v. Archdiocese of Cincinnati,* 2006-Ohio-2625, ¶ 20. That circumstance is present here. In this case, the evidence would also support that plaintiff was aware that Willis had sexually abused other minors, raising the question of what defendant had done to prevent the abuse from happening. We hold that Willis's position as a priest in the Roman Catholic Diocese of Burlington, and the evidence that plaintiff knew that Willis had abused others, were sufficient for the jury to find that plaintiff was on inquiry notice from those facts, and to conclude that the time for filing an action against defendant had commenced. Any investigation would have revealed the fact that Willis had been separated from the church and was no longer a priest, demonstrating defendant's involvement. Because the inquiry notice question was appropriately for the jury, the trial court erred in granting plaintiff judgment as a matter of law on this issue.

¶ 58. The last issue is whether the trial court erred in not excusing, for cause, a juror who was a member of defendant diocese. Prior to trial, the juror answered a juror questionnaire. She disclosed that: (1) she regularly attends mass; (2) the Vermont Catholic Tribune is a source of news that she sees fairly often; (3) she is "very familiar" with the newspaper and television reporting about the lawsuits against the diocese; (4) she is familiar with the names of the attorneys in the case, the present and former diocese bishops, and certain witnesses in the case, including Father Wendall Searles, plaintiff's out-of-state expert witness; and (5) she has "some opinion" on "whether the Diocese is at fault for what may have happened." She was designated as a juror after others had been removed and plaintiff had exhausted most of his peremptory challenges. During voir dire, she disclosed that she was a member of a parish that is a part of the diocese.[13] In

---

[13] Plaintiff has repeatedly referred to the juror as a "member" of a church parish within the diocese or a member of the diocese. The record does show that the

response to a question from plaintiff's counsel, she answered that her membership in the diocese was not "an issue for her" in deciding the case. Plaintiff's counsel also inquired about the opinion the juror disclosed in her questionnaire, but the juror did not describe her opinion with any specifics.[14] She did not disclose whether her opinion favored plaintiff or defendant. Plaintiff's counsel did not inquire about any other responses in the questionnaire. Plaintiff moved to remove the prospective juror for cause, which the court denied. Following that ruling, plaintiff exhausted all his peremptory challenges, and the prospective juror was sworn in as a juror.

¶ 59. Subsequent to the drawing of the jury, and before the trial, plaintiff renewed the challenge for cause relying in part upon the "supplemental jury questionnaire" filed by the juror.[15] Along with the questionnaire response, plaintiff included an open letter from the Bishop of Burlington, Salvatore Matano, that was read and distributed at every Sunday mass in Vermont. It was dated May 8, 2006 and described the decision to put each parish under a trust, apparently so the assets could not be reached by court judgments. He said that "[i]n such litigious times, it would be a gross act of mismanagement if I did not do everything possible to protect our parishes and the interests of the faithful from unbridled, unjust and terribly unreasonable assault." Plaintiff also attached various articles from the Vermont Catholic Tribune, stating the church's position on the litigation and related matters, and other material. Plaintiff asserted in the motion that if any peremptory challenges had been left, he would have used one to exclude this juror.

---

diocese includes the entire state and is located in Burlington, as its name suggests. There is no factual development of what that description, "member," means in this case. We do not know, for example, whether the juror is a "member" of a nonprofit corporation as that term is used in the nonprofit corporation act, 11B V.S.A. § 1.40(21).

[14] The transcript of the voir dire is incomplete. A review of the audio tape indicates that the juror was very soft-spoken, and plaintiff's counsel occasionally talked over her response. The characterization in the text is taken from the transcript supplemented by review of the audio tape. The decision of the trial court states that "we do not know what the opinion is."

[15] Plaintiff called the questionnaire responses newly discovered evidence, but it is clear that plaintiff had the questionnaire response at the time of the voir dire. Apparently, the new information was the letter from the bishop and the excerpts from the Vermont Catholic Tribune.

¶ 60. Plaintiff argues that this juror should have been excused, for cause, on the basis of implied bias because of the relationship of the juror with the diocese. The trial court ruled that it would not presume that all practicing Catholics would be biased in favor of the diocese and denied plaintiff's motion to remove this juror as plaintiff did not establish any actual bias of this juror.

¶ 61. Challenges for cause have been traditionally divided into two categories: those based on actual (or fixed) bias, and those grounded in implied bias. *State v. Sharrow*, 2008 VT 24, ¶ 7, 183 Vt. 306, 949 A.2d 428. A challenge for cause must be sustained "where the prospective juror demonstrates fixed bias or where the law infers that the prospective juror is biased." *Id.* Although plaintiff characterizes the situation as one involving implied bias, he does cite the juror's response that she had an opinion on the liability of defendant, arguably an element of actual bias.[16] In *Sharrow*, we reviewed our prior cases that addressed implied bias. See *id.* ¶¶ 14-19. Implied bias is "bias conclusively presumed as a matter of law, which is attributed to a prospective juror regardless of actual partiality." *Id.* ¶ 14 (quotation omitted). Bias is inferred when "the prospective juror has such a close relationship with a participant in the trial — a witness, a victim, counsel, or a party — that the potential juror is presumed unable to be impartial." *Id.* In *Jones v. Shea*, 148 Vt. 307, 310, 532 A.2d 571, 573 (1987), we found implied bias as a matter of law with respect to a juror who was a current patient of a defendant-doctor in a malpractice suit, recognizing the "powerful trust that a patient may have in his physician's professional judgment."

¶ 62. We have only a very sparse record on which to review the superior court's decision not to grant the challenge for cause. The

---

[16] Although plaintiff argued that the juror had an implied bias because of her membership in the parish, he relied upon evidence of actual bias, like the articles in the Vermont Catholic Tribune. This caused the trial judge to rule on the motion to disqualify as if it were based primarily on a claim of actual bias. For example, the court ruled that "[t]o conclude that any individual, practicing Catholic necessarily shares the Diocesan view regarding liability for past wrongs is essentially to engage in stereotyping." Although we decide this issue primarily on implied bias, we acknowledge that some of plaintiff's evidence on actual bias is relevant to our decision, particularly the evidence that she read the news media accounts of the litigation and read the Catholic Tribune because those sources communicated the bishop's concern that judgments in the priest abuse cases threatened the ability of the diocese to keep and use diocese property, including its churches.

limited information in the record is consistent with the general characterization that "the Roman Catholic Church operates under the notion of individual parishes collecting together as one diocese, with the bishop serving as administrator of the diocese and all assets located within it." T. Radwan, *Keeping the Faith: The Rights of Parishioners in Church Reorganizations*, 82 Wash. L. Rev. 75, 85 (2007). The complaint indicates that the diocese is a "nonprofit religious corporation." We understand that the diocese is hierarchical, with the bishop appointed by Roman Catholic Church hierarchy and not the members of the diocese or a parish. Similarly, the evidence here shows that the diocese employed Father Willis.

¶ 63. We find the issue to be quite close. The decisions generally support the conclusion that if a person were a stockholder in a for-profit corporation that was a party in a civil suit, for example, the person would be disqualified from sitting as a juror in the case because of an economic interest in the outcome. See *Doe v. Wal-Mart Stores, Inc.*, 558 S.E.2d 663, 670 (W. Va. 2001) (holding that it was reversible error not to strike juror for cause who owned defendant stock and whose husband was employed by defendant because "a person is disqualified from sitting on a jury in a case in which he/she has an interest in the outcome of the litigation"); see generally 9A C. Jones, Fletcher Cyclopedia of the Law of Corporations § 4679, at 457 (2008 rev. vol.). The few, and generally old, decisions involving membership in not-for-profit corporations are more divided because the personal economic interest is generally absent. See *Sovereign Camp of Woodmen of the World v. Ward*, 71 So. 404, 405 (Ala. 1916) (holding that it was error to not exclude juror who was a member of the order that issued life insurance contract at issue in the suit); *Burdine v. Grand Lodge of Ala.*, 37 Ala. 478, 481 (1861) ("'[The rule] that any pecuniary interest, even the smallest, in the event of the suit, will disqualify a person from serving on the jury charged with its trial [should be strictly regarded]. . . . If, however, the [organization] is . . . purely eleemosynary, or charitable, then [its] members . . . , as such, cannot be said to have any pecuniary interest in the result of the suit . . . .'"); *Del. Lodge, Int'l Order of Odd Fellows v. Allmon*, 39 A. 1098, 1098 (Del. Super. Ct. 1897) (members of defendant lodge disqualified as jurors, although members of other lodges of the Fellowship are not); *State v. Stuart*, 476 P.2d 975, 978 (Kan. 1970) (holding that in a prosecu-

tion for burglarizing the property of a fraternal association, membership in the association disqualified jurors); *Peanut Growers' Exch., Inc. v. Bobbitt*, 124 S.E. 625, 625 (N.C. 1924) ("[T]he rule at common law . . . [is] if a juror be of the same society or corporation with either party, when such society or corporation is interested in the litigation, he may be challenged upon this ground."); *Alston v. Black River Elec. Coop.*, 548 S.E.2d 858, 862 (S.C. 2001) ("[W]e hold that when a cooperative is a party to a lawsuit, a cooperative member has an inherent pecuniary interest in the case. Thus, the bias of a cooperative member shall be presumed — just as a corporate stockholder's is when the corporation is a party."); (collecting cases involving members of nonprofit utility cooperatives); *State v. Thomlinson*, 100 N.W.2d 121, 122 (S.D. 1960) (members of cooperative association, which was the victim in this burglary prosecution, are disqualified from serving on the jury); *Cleage v. Hyden*, 53 Tenn. (6 Heisk.) 73, 76, 1871 WL 3816, at *2 (1871) (in a dispute over property between trustees of one congregation and members of the Methodist Episcopal Church, members of either church are disqualified from serving as jurors); *Guerra v. Wal-Mart Stores, Inc.*, 943 S.W.2d 56, 59 (Tex. Ct. App. 1997) (members of Sam's Wholesale Club not disqualified from jury in a suit against Sam's Club parent corporation because an employee injured a club member; unlike a business corporation in which stock is worth less from an adverse judgment, the club "membership is still worth the same after a judgment adverse to Sam's" and nothing in the record suggests that club members "would in any way be assessed a portion of any judgment").

¶ 64. Some decisions have suggested that the issue of disqualification turns on whether the possible effect of the litigation on the economic viability of the nonprofit corporation is substantial. See *Searle v. Roman Catholic Bishop of Springfield*, 89 N.E. 809, 811 (Mass. 1909) (holding that it was error to exclude all Catholics from jury when those jurors were not members of the parish at issue: "It does not appear, and we have no reason to suppose, that every Roman Catholic living in a remote part of the diocese can be affected pecuniarily by a small loss or gain of the bishop as owner, in connection with the erection of a Roman Catholic church in Easthampton."); *Barton v. Erickson*, 15 N.W. 206, 206 (Neb. 1883) (reaching same conclusion as *Searle*; as with citizens of county or city that is sued, members of religion, but not the

religious organization that was sued, have an interest "too remote
to affect . . . [juror's] judgment"); *Cassady v. Souris River
Telephone Coop.*, 520 N.W.2d 803, 806-07 (N.D. 1994); *Harmotta v.
Bender*, 601 A.2d 837, 840-41 (Pa. Super. Ct. 1992) (holding that it
was not error to refuse to exclude for cause members of the
diocese because it had a remote financial interest in the outcome,
even though a named defendant; jurors were not members of
specific parish named as a defendant with a direct financial
interest).

■■■ ¶ 65. In this case, we do not know the financial risk of the
litigation for the diocese or the parish, but we do know that the
bishop found that risk to be substantial, and specifically conveyed
his assessment of the risk and its possible adverse consequences
for diocese property to members of the parishes. By her ques-
tionnaire response, we also know that the juror was very familiar
with the media coverage of the litigation against defendant
because of alleged abuse by priests. By media coverage and the
bishop's statements in church and in the Vermont Catholic Tri-
bune, the juror was very likely aware of the bishop's assessment
of the risk, raising the concern that Catholic churches, including
hers, could be lost. We think in these circumstances, plaintiff has
shown the presence of implied bias that should have caused the
disqualification of the juror.

■■■ ¶ 66. Defendant argues that striking this juror on the
basis of implied bias would violate the U.S. Constitution because
she would be struck solely on the basis of religious affiliation. See
*Highler v. State*, 854 N.E.2d 823, 829 (Ind. 2006) (holding that
religious affiliation is an impermissible basis for using peremptory
challenges to strike a prospective juror). The trial court reasoned
that the "undeniable product of plaintiff's motion would be to ban
all Catholics from cases such as this." Defendant is incorrect in its
argument premise — this juror is not struck because she is
affiliated with a religious organization, but because she is a
member of the defendant organization and presumed to be biased.
See *Batson v. Kentucky*, 476 U.S. 79, 97-98 (1986) (permitting
nondiscriminatory reason to justify juror exclusion, if juror exclu-
sion is initially suspect); *People v. Wheeler*, 583 P.2d 748, 762 (Cal.
1978) (recognizing that members of a constitutionally protected
group are "[c]ertainly . . . subject to challenges for cause and
peremptory challenges on grounds of specific bias"), *overruled on*

*other grounds by Johnson v. California*, 545 U.S. 162 (2005). The distinction was recognized in the early Tennessee Supreme Court case of *Cleage v. Hyden*, 53 Tenn. at 77, 1871 WL 3816, at *2:

> So in the case before us, while a member of either church is competent as a juror, as such member, and has no general disqualification by reason of such connection, yet he by that connection in this case happens to be one of the beneficiaries in the very property in litigation, and as such beneficiary can not sit as an impartial trier upon his own rights. He is disqualified by reason of his interest, growing out of his connection with one church or the other, and not on account of his religious opinion, be they what they may.

Defendant, even though it is a religious organization, has no constitutionally protected right to have its own parishioners sit on its jury. Plaintiff is not asking for the systematic exclusion of all Catholics, but rather that persons with a relationship with this particular defendant be excluded from the jury. The former may raise constitutional concerns; the latter does not.

¶ 67. Because plaintiff exhausted his peremptory challenges and sought to challenge the juror involved in this appeal, he preserved his objection to the denial of the challenge for cause. *Jones*, 148 Vt. at 308-09, 532 A.2d at 572-73. As a result of this juror serving on the jury, the possibility exists that plaintiff was denied a fair trial. *Id.* at 310, 532 A.2d at 573. The appropriate remedy when a biased juror sits on the jury is to vacate the jury verdict and remand for a new trial. See, e.g., *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (ordering a new trial because a biased juror actually sat on the jury); *Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1380 (Fed. Cir. 2004) (same).

¶ 68. In his cross-appeal, plaintiff sought a new trial only on damages, assuming that the judgment as a matter of law on the application of the statute of limitations would be affirmed. In light of the reversal of the judgment as a matter of law and the possible impact of the improper juror on the statute of limitations verdict as well as the damages award, the only available remedy is to reverse and remand both the liability and damages determinations for a new trial. See *Parizo v. Wilson*, 101 Vt. 514, 522,

144 A. 856, 860 (1929) ("[A] new trial on all issues is to be granted where this will best subserve the ends of justice.").

*Vacated and remanded for new trial.*