STATE OF VERMONT

SUPERIOR COURT                                              ENVIRONMENTAL DIVISION

                                                   }
                                                   }
In re Downing Act 250 Application   }                    Docket No. 225-11-09 Vtec
                                                   }
                                                   }

Decision and Order

Appellant-Applicants Richard and Joan Downing appealed from the District 7 Environmental Commission's denial of Act 250 permit amendment #7C0600-10-1, involving the placement and illumination of a twenty-four-foot-high cross on their property in Lyndonville, Vermont.[1]   Appellant-Applicants are represented by L. Brooke Dingledine, Esq.  The Land Use Panel of the Vermont Natural Resources Board, represented by Melanie Kehne, Esq., entered an appearance on Question 1 of the Statement of Questions, regarding the merits of the application under Act 250. The State of Vermont, represented by Assistant Attorney General Robert F. McDougall, Esq., entered an appearance with respect to the federal and state constitutional issues and the federal statutory issues raised by Questions 2 through 5 of the Statement of Questions.  Interested parties David A. Gascon, John Irwin, and Barbara Irwin entered appearances representing themselves.

An evidentiary hearing was held in this matter before Merideth Wright,

---

[1]  The cross has remained in place, but not illuminated, during the pendency of this litigation.  The application before the Court (Exs. 3 & 4) requests to place the cross and to illuminate it for twelve to thirteen weeks per year: from Ash Wednesday through Easter Sunday (approximately six weeks), during a week in early September (commemorating the birth of Mary), and from Advent Sunday (four Sundays before Christmas) through Epiphany (January 6) (approximately six weeks).

Environmental Judge. A site visit was taken at the conclusion of the first day of hearing with the parties and their representatives in daylight into dusk, and the parties requested that Judge Wright return later that night to repeat the site visit observations later at night. At the conclusion of the hearing, due to testimony about the effect of moonlight on the appearance of the lighted cross, Applicants requested that the Court's decision be postponed until an additional site visit could be scheduled during clear conditions without moonlight. The parties were given the opportunity to submit written memoranda and requests for findings, and to respond to those filings.

Weather conditions combined with the parties' and the court's schedules made it impossible to hold the requested second site visit for several months. Subsequently, Applicants requested that the Court schedule a supplementary hearing and site visit, both in the daytime and at night, to consider the effect of the newly-installed wind towers on a ridge in Sheffield visible from the project and its neighborhood. The hearing was held and the parties filed supplementary memoranda in late October 2011, with responses being filed on November 21, 2011. The daytime and nighttime site visit to view the Sheffield wind towers was held on the Sunday of the Thanksgiving weekend: November 30, 2011.

Statement of Questions remaining after summary judgment order

This Court's summary judgment decision issued on November 29, 2010 (Summary Judgment Decision) resolved the following portions of the five-question Statement of Questions: Question 3 in its entirety, the federal constitutional Establishment Clause issue from Question 2; and the Vermont constitutional Compelled Support Clause issue from Question 5. This Court is required to consider the permit amendment application de novo, applying the substantive standards that were applicable before the District Commission. 10 V.S.A. § 8504(h).

2

The issues remaining for this decision are those from Questions 1 and 4 of the Statement of Questions:

> 1) Whether the proposed project has an undue adverse impact upon the scenic or natural beauty of the area, aesthetics, historic sites, or rare and irreplaceable natural areas under Criterion 8 of Act 250, [10 V.S.A. § 6086(a)(8)]. . . .
>
> 4) Whether the application of Act 250 to the proposed project substantially burdens the Applicants' free exercise of religion under the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA", 42 U.S.C.A. 2000cc et seq.).

and the remaining issues from Questions 2 and 5:

> Whether the application of Act 250 to the proposed project interferes with the Applicants' . . . right[s] to . . . [the] free exercise of religion and/or free exercise of speech under the [First Amendment to the] U.S. Constitution [or] under the Vermont Constitution.[2]

Permit history/installation of the cross

Applicants own more than 800 acres of land off Darling Hill Road in the town of Lyndon, Vermont. Darling Hill Road extends in a north-northeasterly direction from Route 114 towards East Burke. Applicants and several related family members reside on portions of the property, and operate the Meadow View Farm, the Wildflower Inn, and the Steppingstone Spa and Wellness Center on the property. The Wildflower Inn is a 24-room bed-and-breakfast in which Applicants are business partners and which is operated by their daughter and her husband. The Wildflower Inn's restaurant also serves lunch and dinner. The property is subject to Act 250 Land Use Permit #7C0600 and the various amendments that have been

---

[2] The Summary Judgment Decision determined that Act 250, on its face, does not violate the Free Exercise Clause of the First Amendment to the U.S. Constitution or the free exercise of religion provisions of Chapter I, Article 3 of the Vermont Constitution

made to the permit since it was originally issued for the construction of the Wildflower Inn in April 1985.[3]

On June 8, 2005, Applicants received approval from the District 7 Environmental Commission for the tenth amendment to their permit. Act 250 Land Use Permit #7C0600-10 (the Chapel Act 250 Permit Amendment), allowed them to construct, on a hill on their property, a 34-foot-by-50-foot private stone chapel, which is 39 feet in height and has an attached 28-foot-by-23-foot entry vestibule. The chapel is oriented roughly north-northeast, that is, it is roughly parallel to Darling Hill Road in that location. Its entry vestibule is located on the southern end of the building and its altar is located on the northern end of the building. The chapel building has a basement level accessible by an exterior landscaped path and ramp entering the basement from the west. The basement level is not visible.

The Chapel Act 250 Permit Amendment included conditions specifying that no significant changes to the design or use of the project could be made without written approval of the District Coordinator or the District 7 Environmental Commission, and that all exterior lighting was to be shielded so that the light sources would be concealed from view beyond the perimeter of the project.

Applicants completed construction of the chapel during the summer of 2007. They have also installed an outdoor path, with a series of fourteen posts with scenes representing the Stations of the Cross, in an arc around the northern end of the

---

[3] Amendments to the permit unrelated to the present application have included changes to the sewer plan for the property (7C0600-3), the conversion of a barn into a theater (7C0600-5), the construction of two single family homes with a shared driveway and garage (7C0600-6), the expansion of a maintenance garage and addition of parking (7C0600-7), the renovation of a barn into short-term rental units (7C0600-8), the conversion of a farm house for bed-and-breakfast use (7C0600-9), the construction of a heated 4,500-square-foot pavilion for group functions (7C0600-11), and a seven-lot subdivision of land and construction of new single-family homes on four of the lots (7C0600-12).

chapel building. They have also installed a landscaped rosary garden on the chapel grounds.

On November 28, 2007, Applicants erected a 24-foot-tall, 9-foot-wide cross, which they had acquired from its previous owner who was selling the property in New Hampshire where the cross had previously been installed. Applicants installed the cross outside the northern end of the chapel building, inside the arc of the Stations of the Cross and visible through the window behind the altar.

The cross is constructed from a steel I-beam painted light blue on its sides, and is faced with translucent white plastic panels on the front and back. The back of the cross is shielded so that it is not illuminated. The front of the cross is equipped with eight four-foot-long, 32-watt fluorescent bulbs[4] to internally illuminate the face of the cross facing to the north, away from the chapel building.

Applicants did not initially apply for an amendment to their Act 250 permit for the cross. They did apply in 2007 for municipal conditional use approval of the cross, requesting in that municipal application to keep it illuminated from dusk[5]

---

[4] The type of bulb is now "color 30," a so-called soft white color. Its illumination level was reduced from the type of bulb used when it was first installed and illuminated, so that, when illuminated, it now appears to be dimmer to the human eye than it did when first installed. However, no evidence was presented as to any objective measurement of its illumination levels at either time, that is, how much visible light it emits or the concentration of that light over its surface area.

[5] No definition of the term "dusk" was offered in evidence. Three related terms: "sunset," "civil dusk," and "nautical dusk" are defined on the federal National Oceanographic and Atmospheric Administration (NOAA) website: http://www.weather.gov/glossary/. Sunset is defined in the NOAA glossary as the time at which the last part of the sun drops below the horizon. Civil dusk is defined as "the time at which the sun is 6 degrees below the horizon in the evening; [a]t this time objects are distinguishable but there is no longer enough light to perform any outdoor activities." Nautical dusk is defined as "the time at which the sun is 12 degrees below the horizon in the evening; [a]t this time, objects are no longer distinguishable." The local times for these events are available to the public through

until dawn 365 days per year. The initial municipal decision on this application required Applicants to reduce the size of the cross and to keep it unlit. In 2008, Applicants subsequently filed a revised municipal application seeking to keep the 24-foot-high cross, but to leave it unlit; that municipal application was granted.

In May 2009, Applicants again applied for municipal approval of an illumination schedule for the cross, this time to illuminate the cross from dusk until dawn during approximately 174 days per year: from Ash Wednesday (the beginning of Lent, forty days before Easter) through Pentecost Sunday (fifty days after Easter), during a week in early September commemorating the birth of Mary, during the month of October (dedicated to Mary the Blessed Mother), and from the first Sunday in Advent (generally in late November, four Sundays before Christmas) through Epiphany (January 6).

During the municipal hearings, after the Act 250 application at issue in this matter also had been filed, Applicants offered to illuminate the cross during the dates requested in the present Act 250 application, or, in the alternative, to illuminate the cross until 11 p.m. on 365 days per year. The municipal decision granted conditional use approval allowing the cross to remain in place but only allowing it to be illuminated from dusk until dawn during a portion of the requested time: from the first Sunday in Advent through Epiphany, that is, during approximately six weeks from late November through January 6.[6]

---

the NOAA website or at other publicly accessible websites; the local Lyndonville time for sunset, for example, is posted on the website of the Fairbanks Museum and Planetarium: http://www.fairbanksmuseum.org/CurrentConditions. In Vermont, a little more than an hour elapses between sunset and nautical dusk. (The Court has taken judicial notice of this fact as presented on the U.S. Naval Observatory website, available at http://aa.usno.navy.mil/data/docs/RS_OneYear.php as referenced by the NOAA website.)

[6] The Downings' appeal of that decision is the subject of Docket No. 139-7-09 Vtec,

On June 8, 2009, Applicants applied for Act 250 approval of the application that is now before the Court. That application proposes to amend the Act 250 Chapel Permit (#7C0600-10) to allow the placement and the illumination of the already-installed cross. In the application, Applicants propose to illuminate the cross from dusk to dawn during the following specific periods totaling approximately twelve to thirteen weeks per year: from Ash Wednesday through Easter Sunday (approximately six weeks), during a week in early September commemorating the birth of Mary, and from Advent Sunday (four Sundays before Christmas) through Epiphany (January 6) (approximately six weeks). The District 7 Environmental Commission denied both the placement and the illumination of the cross; that denial is the subject of the present appeal, Docket No. 225-11-09 Vtec.

Part I – Application for placement and illumination of cross under Act 250 aesthetics criterion

Act 250 Criterion 8 (Aesthetics) requires that the project will not have an undue adverse effect on the scenic or natural beauty of the area or on aesthetics.[7] 10 V.S.A. § 6086(a)(8). Harvey & West 65 Unit Campground Act 250 Application, No. 110-7-10 (Vt. Super. Ct. Envtl. Div., Nov. 9, 2011) (Wright, J.). With respect to Criterion 8, the burden of proof is on the party opposing the applicant to show an unreasonable or adverse effect. 10 V.S.A. § 6088(b); see In re Denio, 158 Vt. 230, 237 (1992).

The so-called Quechee test, named for a 1985 decision of the former Environmental Board, In re Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 17–20 (Vt. Envtl. Bd. Nov 4,

which has been placed on inactive status pending the outcome of the Act 250 case.
[7] The other aspects of criterion 8, involving historic sites or rare and irreplaceable natural areas, are not at issue in the present case.

1985), provides a two-step methodology for analyzing whether a project will not have an undue adverse effect on aesthetics, that is, whether it will fit its context and be in harmony with its surroundings. See In re McShinsky, 153 Vt. 586, 591–93 (1990) (adopting the analysis employed by the former Environmental Board when determining compliance under Act 250 Criterion 8).

As described by the Vermont Supreme Court in In re Times & Seasons, LLC, the Court must take the following two-pronged approach to determine if an application complies with Act 250 Criterion 8 as to aesthetics: first, the Court must determine if the project will have an adverse aesthetic impact, and, if so, it must then determine whether the adverse impact will be undue. 2008 VT 7, ¶ 8, 183 Vt. 336. The project has an adverse impact if it is not "in harmony with its surroundings" in other words, if it does not "fit the context within which it will be located." Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 18. An adverse impact is undue if the project "violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of an area"; or if the project "offend[s] the sensibilities of the average person"; or if the applicant has "failed to take generally available mitigating steps which a reasonable person would take to improve the harmony of the proposed project with its surroundings." Times & Seasons, LLC, 2008 VT 7, ¶ 8; In re Rinkers, Inc., 2011 VT 78, ¶ 9; In re Eastview at Middlebury, 2009 VT 98, ¶ 20, 187 Vt. 208.

Darling Hill Road extends in a north-northeasterly direction from Route 114 towards East Burke, proceeding generally uphill from the elevation of Route 114. The chapel is located on a hill above the elevation of Darling Hill Road, to the west of the road. The chapel is visible from Darling Hill Road from adjacent to the chapel until a point just beyond the Wildflower Inn, a distance of about 4000 feet by scale. The Gascon property is located east of the roadway directly across from the chapel, at the elevation of the roadway. North of the Gascon property, the land east of the

8

road within view of the chapel, including the Devereaux property, is generally higher in elevation than the roadway. The land to the west of the road forms a valley of gently rolling open pasture and farm land sloping generally downhill from the elevation of the road, surrounded by forested land to the south of the chapel and to the west and north of the open pasture and farm land. The Irwin property is located west of the roadway, north of the chapel and south of the Wildflower Inn, with the existing house located near the roadway. A second potential site for construction of a house on the Irwin property is located farther to the west than the existing Irwin house; that site has a clear view of the chapel from the north.

Views looking south and southwest from points uphill along Darling Hill Road show the chapel against a dark forested background, and show the cross against the end of the chapel. The cross is proportional to and smaller than the end of the chapel. The upright and cross pieces of the cross are thin in proportion to their length,[8] so that in daylight the cross does not appear to be heavy or to dominate the appearance of the northern end of the chapel. In daylight, when seen against the end of the chapel, or in the same field of view as the chapel, the unlit cross is congruent with its context, even though it is light in color.[9] When seen from below, near the Gascon property, against the sky in the daytime, the light-blue-and-

---

[8] The upright segment of the cross is 24 feet in height, 14¼ inches in width, and 8 inches in depth; the cross piece is 9 feet wide, inclusive of the width of the central upright. The significance to Applicants of the dimensions and appearance of the cross is discussed in more detail below in Part II.

[9] Views of the cross from the house on the Devereaux property, and from the potential second house site on the Irwin property, occupy a more central portion of the mid-distance visual field than from the public roadway, and the cross is seen against the dark forest background just beyond the chapel. Nevertheless, during the daytime from these vantage points, the unlit cross is seen in the context of the chapel, which appears in the same visual field.

white cross is not obtrusive in color, whether the sky is blue, contains white clouds, or is an overcast gray.

Views looking west from Darling Hill Road show forest in the distance beyond the pastures. The very distant scenic views looking west from the Wildflower Inn and from some locations on the roadway, and looking northwest from the chapel grounds, show hillsides and mountain ridges beyond the open rolling farm and pasture land. A group of wind towers along the mountain ridge in Sheffield, approximately eight miles away, are visible in the very far distance from the chapel grounds and from the Wildflower Inn, as well as from some locations along the roadway. In the daytime the towers, which are white, appear to be similar in shape to the cross, but because they are in the far distance they appear to be extremely small and are not obtrusive or even particularly noticeable to a casual observer.[10] From Darling Hill Road, the view of the chapel and cross does not also contain the distant view of the towers; that is, it is necessary for the observer to turn from looking at the towers in order to see the chapel and the cross, and vice versa.

At night, the view of the fields and forest to the west and northwest of Darling Hill Road is completely dark. Locally in the Darling Hill neighborhood, only relatively dim lights incidental to the residential and inn uses are on in the evening and many or most of these are not left on all night.

At night some dim lights of residences and institutions are visible in the very far distance, on the hillsides to the west and northwest beyond Route 5. At night, the red warning lights at the tops of the Sheffield wind towers are also visible at the very far distant ridgeline; they appear to blink intermittently, probably due to their blades obscuring the light source intermittently as they turn. At the distance from

---

[10] The photographs in evidence as Exs. 201, 202, and 204 from the supplemental hearing in this matter foreshorten the middle distance valley, making the wind towers appear to be closer and more prominent than they appear to the human eye.

which they are seen from the Darling Hill neighborhood, the apparently blinking, red lights of the Sheffield wind towers are not bright or obtrusive, and do not draw the eye.

The Darling Hill Road neighborhood is rural in character. It contains a few residences and farmhouses near the roadway, as well as the Wildflower Inn and restaurant, and the Steppingstones Spa businesses. An historic mansion and another inn are located farther north on Darling Hill Road; however, they are beyond the area from which the cross and chapel are visible. From a vehicle driving north and uphill along Darling Hill Road, it is necessary to turn to look to the left and behind in order to see the cross. From a vehicle driving south down Darling Hill Road, the cross is visible in the observer's direct field of vision. It is visible during the day against the chapel or against the forest adjacent to the chapel.

After the surroundings have become dark, the illuminated cross is visible as the brightest object in the field of vision, and is devoid of context. At night, when the cross is illuminated, it is the most noticeable feature in the field of vision of an observer traveling down Darling Hill Road from the Wildflower Inn to near the chapel. Even though its illumination has been reduced so that it is not as bright as it was when first installed, it is large and appears bright. It draws the eye and is incongruous in its dark rural setting. Its appearance is startling to an observer, especially to one traveling south on Darling Hill Road, when it appears suddenly in the middle distance.

However, for approximately an hour commencing at sunset, during dusk or twilight, while the surrounding landscape and nearby chapel remain visible but are becoming dark, the illuminated cross does not appear to be so startlingly bright. When observed during early twilight conditions, as observed during the site visit, it first appears to the eye to be dimly glowing; it makes a slow transition and does not appear to be startling or obtrusive in its setting until the surrounding darkness has

11

increased to the point at which objects are no longer distinguishable, that is, by about an hour after sunset.

Because the aesthetic effect of the cross' illumination is distinct from that of the cross as a structure in the daytime landscape, this decision considers Applicants' request for the illumination of the cross under Criterion 8 of Act 250 separately from their request for approval to leave the cross in place as installed.

Placement, size, dimensions, and color

Although the cross is large, it is relatively slender in its construction. It is smaller than and proportional in scale and shape to the north end of the chapel building. It is placed so that it is seen from the public roadway and from the neighbors' properties either against the northern end of the chapel, or against the nearby forested background, not against the distant scenic views.

Some observers, to whom the cross is a positive and meaningful symbol, do not perceive it to have any adverse effect on the scenic beauty or aesthetics of the area. Seen only as a large man-made object in an otherwise rural residential and agricultural area, others perceive the cross as having an adverse effect on the scenic beauty or aesthetics of the area in their viewshed.

In daylight, that is, when the cross can be seen together with and in the context of the chapel, it fits its context and is in harmony with its surroundings. Its eight-inch-wide sides are sufficiently narrow so that the light blue color is not obtrusive when it is seen against the sky. The approximately one-foot-wide translucent white panels on the front of the cross make it somewhat more noticeable than a wood or earth-toned cross would be when seen against the stone of the chapel or the forest background, but in daylight, the panels are narrow enough so that the non-illuminated cross as a whole is not obtrusive or incongruous in the context of the large stone chapel in its rural surroundings. The non-illuminated

12

cross fits the context of the rural chapel, and is in harmony with its surroundings of the chapel, forested background, and sky.

Accordingly, the placement, size, dimensions, and color of the cross, in daylight, will not have an adverse effect on the scenic beauty or aesthetics of the area.

Illumination

The illumination of the cross from dusk to dawn will, however, have an adverse effect on the scenic beauty of the area's twilight and nighttime rural landscape and on the aesthetics of the area. In darkness, it does not fit in its context and is not in harmony with its dark rural surroundings. The illuminated cross can be seen from a distance up the valley, both from Darling Hill Road and from the Devereaux and Irwin properties, as well as from the Wildflower Inn. It draws the eye and is obtrusive in the field of vision. The illuminated cross is especially noticeable when it comes into view of an observer traveling towards the south along Darling Hill Road. The intermittent red blinking lights on top of the Sheffield wind towers in the very far distance are barely noticeable and do not draw the eye when observed at night from the Darling Hill neighborhood. The towers do not constitute a visual context for the illuminated cross, both for this reason and because the cross and the wind tower lights are not simultaneously in the field of vision of an observer from Darling Hill Road. Therefore the Court must proceed to determine whether the adverse effect is undue by applying the Quechee criteria. If any one of the three factors is found, the Court must conclude that the adverse effect of the cross' illumination is undue.

Illumination - Clear, written community standard

Neither the municipal plan nor the zoning ordinance, nor any other written community standard was provided in evidence from which the Court could

determine whether there is a clear, written community standard regulating nighttime illumination in the Town of Lyndon generally, or aimed at preserving the scenic beauty or aesthetics of the Darling Hill neighborhood in general.

Illumination - Reasonable mitigating steps

As stated in In re Rinkers, Inc.,

> When a project is found to have an adverse impact on aesthetics, the applicant must "take generally available mitigating steps to reduce the negative aesthetic impact of a particular project," otherwise, "[f]ailure to take advantage of available alternatives may render an aesthetic impact unduly adverse." In re Stokes Commc'ns Corp., 164 Vt. 30, 39 . . . (1995). Ordinarily "a generally available mitigating step is one that is reasonably feasible and does not frustrate [either] the project's purpose or Act 250's goals." Id. at 39 . . . .

2011 VT 78, ¶ 12.

The current apparent illumination level of the cross represents a reduction from its brightness when originally installed, although, as discussed in footnote 4, above, no objective measurement of its brightness or illumination level has been provided to the Court. The illumination schedule proposed in the present application from Ash Wednesday through Easter Sunday, during a week in early September commemorating the birth of Mary, and from Advent Sunday (four Sundays before Christmas) through Epiphany (January 6), that is, during a total of twelve to thirteen weeks per year, also represents a mitigating step, as Mr. Downing testified at trial that he would prefer the cross to be lit every night from dusk to dawn, year round, and that he would prefer the illumination to be so bright that it could be seen in Canada.

Despite these mitigating steps, Applicants have failed to take all the generally available mitigating steps to improve the harmony of the proposed project with its surroundings. It is reasonably feasible to limit the daily illumination schedule of the cross (during the periods proposed by Applicants) to the hour commencing at

14

sunset, when the illuminated cross does not appear to be so startlingly bright as during the nighttime. Such a limitation would allow reasonable illumination of the cross, and would reduce the adverse effect of the cross' illumination on the scenic beauty and aesthetics of the area's twilight and nighttime rural landscape so that the adverse effect would not be undue. See In re Hannaford Brothers Co. and Southland Enters., Inc., No. 4C0238-5-EB, Findings of Fact, Conclusions of Law, and Order (Altered), at 13, 18, 28 (Vt. Envtl. Bd. Nov. 27, 2002) (concluding that allowing the internal illumination of a sign for a large store would create an unduly adverse aesthetic impact because its orientation would create bright light "against the dark background of trees" and "contribute to an increase in ambient nighttime light" but that prohibiting its internal illuminate would constitute reasonable mitigation).

For this reason, the dusk-to-dawn illumination of the cross during the periods proposed by Applicants would create an undue adverse effect on the scenic beauty and aesthetics of the area.

Illumination – Sensibilities of average person

In addition, the illumination of the cross from dusk to dawn during the three periods proposed by Applicants totaling twelve to thirteen weeks per year (or its illumination from dusk to dawn during any longer period), offends the aesthetic sensibilities of the average person because this rural area is dark and is not otherwise illuminated all night long. The illuminated cross is particularly shocking and out of character with its dark rural surroundings when it first appears to an observer who is traveling south on Darling Hill Road in full darkness.

On the other hand, the illumination of the cross for one hour beginning at sunset, during the three periods proposed by Applicants, which total twelve to thirteen weeks per year, would not offend the sensibilities of the average person in this rural area. Although the context of the chapel building gradually becomes dim and indistinguishable over the course of that hour, it remains sufficiently visible to

15

provide a harmonious setting for the cross.  Moreover, other lights are on in the area in the early evening, and the cross does not appear to be unduly bright or shocking in the twilight conditions.

Accordingly, the illumination of the cross for one hour beginning at sunset during each day of the three periods proposed by Applicants—from Ash Wednesday through Easter Sunday, during a week in early September commemorating the birth of Mary, and from Advent Sunday (four Sundays before Christmas) through Epiphany (January 6)—at the current illumination level and color value will not have an undue adverse effect on the scenic beauty or aesthetics of the area and is therefore approved.  The illumination of the cross later into the evening and at night would have an undue adverse effect on the scenic beauty and aesthetics of the area, and cannot be approved under Criterion 8 of Act 250.

Part II – Question 4 and remaining constitutional issues from Questions 2 & 5:

All that remains for the Court to consider is whether the limitation imposed in this decision on the internal illumination of the cross violates either the federal statute raised by Question 4, or the remaining constitutional considerations as to religious exercise or freedom of speech raised by Questions 2 and 5.

Applicants are life-long, devout Roman Catholics.  They built the chapel in thanks to the Virgin Mary.  They regularly and sincerely attend mass and undertake the essential sacraments of their faith.  They also regularly and sincerely express and increase their faith through prayer and private devotional practices such as saying the rosary or praying at the stations of the cross.

Certain private devotional practices such as these have long been officially recognized or sanctioned by the Catholic Church.  Other devotions may be allowed to be practiced while they are under investigation by the Catholic authorities,

16

although they are not or not yet officially recognized. The cross at issue in the present case is the focus of one such devotion that the Church allows to be practiced although it remains under investigation and has not been officially recognized.

The cross at issue in the present case is a cross of a particular type, color, size, and dimensions known as a "Cross of Love of Dozulé." It is constructed at 1/100 scale of a cross reportedly first seen in a series of visions in the 1970s by a woman in the town of Dozulé, France. The larger scale cross seen in the visions is known as the "Glorious Cross" of Dozulé to distinguish it from the smaller "Cross of Love." Applicants believe that, in these visions, Jesus Christ directed that the Glorious Cross, measuring 738 meters (2421 feet) in height,[11] with arms each extending for 123 meters (403.5 feet), be constructed to serve as a beacon to all people, heralding the return of Jesus Christ. See Exs. 15 and 16. Applicants also believe that, after people failed to construct a cross of those enormous dimensions, later visions directed that thousands of "Crosses of Love" at 1/100 the scale of the Glorious Cross be constructed all over the world. They believe that the devotion requires the cross to be oriented with its arms in an east-west direction, to be blue and white in color, associated with the Virgin Mary, and to be a particular size and scale (7.38 meters or 24.21 feet in height, with each arm of the cross extending outwards from the upright for 1.23 meters or 4.035 feet). They believe that a particular prayer must be said in connection with the Dozulé devotion and regularly and sincerely pray the Dozulé prayer. They believe that the visions directed that each Cross of Love be illuminated, but also that the Lord can work around human obstacles.

Applicants believe that they have been chosen to be guardians of one of these thousands of "Crosses of Love" of Dozulé. With regard to the abbreviated

---

[11]    According to other messages reported in the 1990s, see Ex. 16, the height represents the elevation of Calvary, in Jerusalem, the location of the Crucifixion.

illumination schedule requested in the application, Applicant Joan Downing testified that "I believe that the Lord knows that we're doing all we can and that He is okay with the limited illumination." Many such crosses have been constructed world wide; seven or eight of which are located elsewhere in Vermont. Applicants also have a 1/1000 scale indoor Dozulé cross, about 30 inches in height, meant to be used for indoor or home devotions, which is located downstairs in the chapel.

Question 4 of the Statement of Questions: RLUIPA

Question 4 of the Statement of Questions asks whether Act 250 as applied to the proposed cross substantially burdens Appellant-Applicants' free exercise of religion under the federal Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). RLUIPA prohibits the state from imposing or implementing a land use regulation in a way that "imposes a substantial burden" on "the religious exercise of a person" or group, unless the regulation is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C.A § 2000cc(a)(1).[12]

RLUIPA "does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination and unfair delay." 146 Cong. Rec. S. 7774, 7776 (2000) (Joint Statement of Senator Hatch and Senator

---

[12] Applicants have the initial burden of demonstrating that Act 250, as applied to this application, imposes a substantial burden on their exercise of religion. 42 U.S.C.A. § 2000cc-2(b). If Applicants produce of prima facie evidence to support their claim, the burden shifts to the State to persuade the Court that regulation of the cross' illumination under Act 250 does not violate RLUIPA. Id. If the Court determines that Applicants' religious exercise is substantially burdened, the State must then prove that Act 250 is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C.A. § 2000cc(a)(1).

Kennedy).

Because the present decision allows the current placement, size, dimensions, and color of the cross, and allows it to be internally illuminated for one hour a day, beginning at sunset, during the three periods requested by Applicants (which total twelve to thirteen weeks per year), all that remains to be analyzed under RLUIPA is whether the limitation of the cross' internal illumination to an hour in the early evening imposes a substantial burden on Applicants' religious exercise.

RLUIPA defines a religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5(7)(a). Religious exercise includes the use, conversion, or construction of property for the purposes of religious activity. 42 U.S.C.A. § 2000cc-5(7)(b); see also Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 347–48 (2d Cir. 2007). There is no question that Applicants are entirely sincere in their religious beliefs, and that their construction and use of the chapel, the Stations of the Cross, and the rosary garden are sincere religious exercises or devotions to express and strengthen their faith. Equally, their proposed placement of the cross, including its size, relative dimensions, orientation, color, and proposed illumination, is a sincere religious exercise, even though it is a private devotion and is not mandated or required officially by the Catholic Church.[13]

---

[13] The State argues that Applicants did not present evidence that the illumination of the cross during particular hours, dates, or seasons of the year is essential to their religious practices or mandated by their religion. However, such an analysis is precluded under RLUIPA's definition of religious exercise as "whether or not compelled by, or central to" Applicants' system of religious belief. 42 U.S.C.A. § 2000cc-5(7)(a). A court may inquire into the sincerity of an applicant's religious exercise, but not into whether the exercise is a "core religious belief[]." See, Int'l Church of Foursquare Gospel v. City of San Leandro, 673 F.3d 1059, 1069 (9th Cir. 2011).

Federal courts have interpreted a "substantial burden" on individuals' exercise of religion to be a burden that puts substantial pressure on religious adherents to modify their religious behavior and violate their religious beliefs, or to choose between forgoing either a precept of their religion or a generally available governmental right. See Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir., 2006) (citing to decisions from other circuits articulating a similar understanding of the term "substantial burden" in RLUIPA); see also Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 349 (2d. Cir., 2007) (concluding that the formulation of the "substantial burden" definition that is the most applicable to zoning applications for the expansion of a religious institution's facilities is whether the government is coercing the institution to change religious behavior).

To constitute a substantial burden, the regulation must do more than merely inconvenience the applicant's religious beliefs. See Westchester Day School, 504 F.3d at 349; Shepherd Montessori Ctr. Milan v. Ann Arbor Charter Tp., 675 N.W.2d 271, 281 (Mich. Ct. App. 2003); see generally Bram Alden, Reconsidering RLUIPA: Do Religious Land Use Protections Really Benefit Religious Land Uses, 67 UCLA L. Rev. 1779 (2010); 3 Am. Law. Zoning § 28.5 (5th ed. 2012) ("[N]umerous courts have explained that the fact that compliance with land use regulations may be costly, time consuming or inconvenient does not automatically render those land use regulations substantial burdens."). The availability of reasonable alternatives to what a zoning permit applicant is proposing, even if those alternatives are more expensive or less desirable, may prevent a regulatory decision that restricts the proposal from being a substantial burden on the applicant's exercise of religion. See, e.g., Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003) (concluding that the city's regulations restricting the location of churches did not create a substantial burden on the plaintiff churches' religious exercise); Vision Church v. Vill. of Long Grove, 468 F.3d 975, 984, 999–1000 (7th Cir., 2006) (concluding that a facially neutral

zoning ordinance that effectively restricted the size of a church facility proposed by applicant did not substantially burden the applicant's religious exercise even though the applicant applied to construct a much larger facility than allowed under the regulations). In Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel for Baltimore County, the court ruled that the denial of a variance for a proposed sign that was significantly larger than allowed under the zoning regulations did not substantially burden a church's religious exercise, concluding that

> [i]n sum, the Church has not been denied *any* use of a sign as a means of evangelism, but only the non-conforming use of a sign that cannot be as large and eye-catching as the Church might desire. Denial of its variance request burdens the Church's religious exercise, but not substantially, so as to make any use of a sign for uplift and recruitment "effectively impracticable" or to compel the congregants to "violate [their religious] beliefs."

941 A.2d 560, 574–75 (Md. Ct. Spec. App. 2008).

In the present case, the Court has applied Criterion 8 of Act 250 to approve the location, size, dimensions, color, and appearance of the cross, as well as to approve the illumination of the cross for one hour a day, beginning at sunset, during the three periods requested by Applicants. The Court has disapproved the remainder of the requested nighttime hours of illumination, that is, after an hour after sunset to dawn. This limitation is not a substantial burden on Applicants' religious exercise. The cross remains in place at the size, orientation, dimensions, and color which Applicants believe renders it a Cross of Love of Dozulé. They are able to practice their devotion and to pray the Dozulé prayer in conjunction with the cross. The cross can be observed by travelers in the context of the chapel during daylight hours, and Applicants are able to illuminate the cross for an hour commencing at sunset so that it can be observed as illuminated, during the three periods for which they requested its illumination.

21

Because the Court concludes that allowing a single hour of early evening illumination of the cross on the requested dates, rather than its illumination all night long, does not substantially burden Applicants' religious exercise, it is not necessary to analyze whether the restriction is nevertheless justified by a compelling governmental interest.

Questions 2 and 5 of the Statement of Questions: Free Exercise of Religion

The Free Exercise Clause of the First Amendment to the U.S. Constitution "guarantees the freedom to hold religious beliefs and the freedom to act in accordance with those beliefs," but that freedom may be limited by appropriate regulation. Turner v. Roman Catholic Diocese of Burlington, 2009 VT 101, ¶ 27, 186 Vt. 396 (2009) (citing Cantwell v. Connecticut, 310 U.S. 296, 303–04 (1940)). The Vermont Constitution does not offer any more protection to the free exercise of religion than does the federal Constitution. See State v. DeLaBruere, 154 Vt. 237, 265 (1990). As the Vermont Supreme Court explained in Turner,

> Laws that are neutral and of general applicability do not violate the Free Exercise Clause. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."); Employment Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 878-82 (1990) (stating that, unless the state attempts to regulate religious beliefs, the communication of religious beliefs, or the raising of one's children in those beliefs, the Free Exercise Clause does not bar neutral, generally applicable laws).

2009 VT 101, ¶ 27.

In the Summary Judgment Decision, the Court determined that Act 250 was a neutral law of general applicability that does not violate the Free Exercise Clause or its Vermont equivalent. In the present case, Act 250 has been neutrally applied to

22

Applicants' cross, and has only an incidental effect of burdening their religious practice with respect to the cross. Its regulation is not related to whether it is a religious symbol or structure, but rather is related to the aesthetic effect of the internal illumination of any similarly sized object in that location. The cross is allowed to remain in place and in use by Applicants as a devotion; the location, size, orientation, relative dimensions, and color of the cross are approved. Its internal illumination is allowed for one hour a day, beginning at sunset, during the three periods requested by Applicants, when its illumination will not have an undue adverse effect on the scenic beauty or aesthetics of the area. As applied, Act 250 does not violate the Free Exercise Clause of the U.S. Constitution or the equivalent section of the Vermont Constitution.

Questions 2 and 5 of the Statement of Questions: Freedom of Speech

The Summary Judgment Decision determined that Act 250 is a content-neutral law and is narrowly tailored to serve the State's interest in protecting the lands and environment of Vermont. The only issue remaining for decision with respect to the free speech provisions of the state or federal constitutions is whether Act 250, as applied to the cross, leaves open alternative channels of communication.

Although it appears in their Statement of Questions, Applicants did not argue in their memoranda that the regulation of the cross under Act 250 violates Applicants' freedom of speech. Nevertheless, to the extent that the existence of the cross in its location and its illumination constitutes "speech" under the federal or state constitutions, the decision the Court issues today allows the visibility of the cross during the daylight hours year round, as well as its illumination for one hour a day, beginning at sunset, during the three periods requested by Applicants. During the hours of darkness, Applicants can hold events inside the chapel, including the illumination indoors of the 1/1000 size cross, as alternative channels of

23

communication. As applied to the regulation of the cross by this decision, Act 250 does not violate either the federal or the state constitutional protections of Applicants' freedom of speech.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the cross as installed is approved to remain in place, and that it is approved to be illuminated at its current or any lesser level of illumination, for one hour commencing at sunset,[14] during each day of the three periods proposed by Applicants: from Ash Wednesday through Easter Sunday, during a week in early September commemorating the birth of Mary, and from Advent Sunday (four Sundays before Christmas) through Epiphany (January 6). Because no evidence was presented in the application or at trial providing an objective measurement of the cross' illumination level, the Court hereby requires Applicants to submit to the District Commission an objective measurement of the cross' current illumination level and color value to be approved by the District Commission for incorporation into the permit. Applicants shall submit this measurement no later than June 15, 2012. Thereafter, the Land Use Panel shall direct the District Commission to perform the ministerial task of issuing Act 250 Land Use Permit #7C0600-10-1 consistent with this decision, including the objective measurement of the allowed

---

[14] Local sunset may be determined from the website of the Fairbanks Museum and Planetarium, which gives the time of sunset in Lyndonville on its website at http://www.fairbanksmuseum.org/CurrentConditions.

illumination level and color value, and incorporating any elements of the District Commission decision that were not appealed.


Done at Berlin, Vermont, this 10th day of May, 2012.


_____
                Merideth Wright
                Environmental Judge